782 N.W.2d 848 (2010)
279 Neb. 661
SMEAL FIRE APPARATUS CO., a Nebraska corporation, appellee and cross-appellant,
v.
Robert KREIKEMEIER and R.K. Manufacturing, Inc., appellants and cross-appellees.
No. S-08-1230.
Supreme Court of Nebraska.
April 16, 2010.
*855 Thomas B. Thomsen, of Sidner, Svoboda, Schilke, Thomsen, Holtorf, Boggy, Nick & Placek, Fremont, for appellants.
Paul R. Elofson, of Fitzgerald, Schorr, Barmettler & Brennan, P.C., L.L.O., Omaha, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.

I. SUMMARY
This is a second appeal from a contempt order. The district court entered a preliminary injunction in 1989 and a permanent injunction in 1990, upon the parties' stipulated settlement. The injunction enjoined the appellants, Robert Kreikemeier and R.K. Manufacturing, Inc. (collectively R.K.), from using or disclosing a manufacturing process used by Smeal Fire Apparatus Co., Inc. (SFAC), in the hydraulic systems of its aerial firefighting ladders. The district court has twice found that R.K. willfully disobeyed its injunction order. In our 2006 opinion, Smeal Fire Apparatus Co. v. Kreikemeier (Smeal I),[1] we dismissed R.K.'s first appeal from the court's first contempt order for lack of a final order.
On remand, a different judge again found R.K. in contempt of the injunction and imposed a coercive sanction of $5,000 per day, costs, and fees. SFAC moved for summary dismissal of R.K.'s appeal, arguing that the second order was also not a final, appealable order.
Although there is no graceful way of retreating from this court's previous rulings, some of our troubling contempt cases have created needless difficulties at both the trial and the appellate levels. An untangling of the snarls was long overdue. *856 Our decision changes the legal landscape of our present contempt law. We overrule a long line of cases affecting a trial court's jurisdiction, an appellate court's jurisdiction, and the standard of proof in civil contempt cases.
We first address the jurisdictional issues. In determining that we have jurisdiction, we overrule cases that have unnecessarily limited a court's inherent and statutorily granted contempt powers and cases that have precluded appellate review of final civil contempt orders. These cases' roots run deep. Correcting our contempt jurisprudence will require extensive pruning.
The first jurisdictional issue presents the question whether a district court has power in a contempt proceeding to order compensatory or equitable relief. Next, we address whether a contemnor can appeal a civil contempt order from a separate postjudgment proceeding.
We will set out our holding with more specificity in the following pages; but, briefly, it is this: We hold that in a civil contempt proceeding, a district court has inherent power to order compensatory relief when a contemnor has violated its order or judgment. We further hold that whether a contempt sanction is civil or criminal is relevant only when a party appeals from an interlocutory order of contempt. An interlocutory contempt order is an order that a court issues during an ongoing proceeding before the final judgment in the main action. Because R.K. appeals a final contempt order from a supplemental postjudgment contempt proceeding, we have jurisdiction.
Regarding the substantive issues, we conclude that the court erred in finding that R.K. had willfully violated the injunction. The injunction contained ambiguous terms that could only be clarified by reviewing the preliminary injunction record. A review of that record shows that the injunction did not give R.K. clear warning that it could be held in contempt for its conduct.
Finally, we conclude that for future cases, the standard of proof in civil contempt proceedings is clear and convincing evidence, unless the Legislature has mandated another standard.

II. BACKGROUND
SFAC and R.K. both manufacture aerial firefighting ladders. SFAC formerly employed Kreikemeier. In 1990, to resolve its trade secrets claim against R.K., SFAC obtained an agreed-upon injunction order. The order enjoined R.K. from using or disclosing SFAC's manufacturing process for a hydraulic valve spool.
In 2001, SFAC claimed that R.K. had violated the injunction. And the district court found R.K. to be in willful contempt. The court ordered R.K., as a condition to purge itself of contempt, to take the following actions: (1) within 30 days, notify the court of all of R.K.'s units with parts manufactured that violated the injunction; (2) within 60 days, notify purchasers that their use of the units violated the injunction; and (3) within 2 years, make a good faith effort to obtain agreements with the unit purchasers to exchange the parts. It also ordered R.K. to pay court costs, attorney fees, and expert witness fees.
R.K. appealed. The Court of Appeals relied on this court's decisions that a contemnor can only attack a coercive sanction through a habeas corpus proceeding. It concluded that R.K. could not appeal the district court's order imposing a coercive sanction.[2] The Court of Appeals nonetheless *857 concluded that it could review that part of the order requiring R.K. to pay costs and fees because R.K. could not avoid those awards. It concluded that the district court had not abused its discretion in making these awards. We granted R.K.'s petition for further review.
In Smeal I,[3] like the Court of Appeals, we also dismissed R.K.'s appeal for lack of jurisdiction. But we vacated the Court of Appeals' decision exercising jurisdiction over the award of attorney fees and costs. We repeated our previous holding that "`the imposition of a coercive sanction is never final and may not be attacked by direct appeal.'"[4] Also, we repeated our other previous holding that a district court lacks jurisdiction to order equitable relief in a contempt proceeding. We further concluded that the court's award of attorney fees and costs could not be extracted from the impermissible grant of equitable relief. We dismissed the appeal and vacated the court's order, including the award of attorney fees and costs.
On remand, after a hearing, the district court reaffirmed its earlier finding by a different judge that R.K. was willfully in contempt. The court adopted and reiterated the earlier injunction requirements, prohibiting R.K. from using SFAC's manufacturing process. It interpreted our mandate as requiring it to impose a purge plan that did not grant equitable relief to SFAC and to include a coercive sanction to obtain R.K.'s compliance.
Accordingly, the court's order required R.K. to do two things within 10 days. First, R.K. had to inform its current and former employees, officers, managers, stockholders, partners, and manufacturing agents of the court's order prohibiting the grinding or milling of the disputed valve spool, in the manner exemplified by exhibit 210. Second, Kreikemeier had to file an affidavit attesting under penalty of perjury that R.K. had held a company meeting in which R.K. informed the above persons of the court's prohibition on the manufacturing process, as illustrated by a photograph from exhibit 210. As a coercive sanction, the court stated that if R.K. failed to comply with its order, it would assess a fine of $5,000 per day, jointly and severally, until R.K. complied. The fine would begin on the 11th day after the court entered its order. Finally, the court assessed $126,601.29 in costs and attorney fees against R.K.
R.K. appealed the court's finding of contempt before the 11th day. Quoting from our 2006 decision, SFAC again moved this court to summarily dismiss the appeal for lack of jurisdiction because there was no final order. R.K. resisted SFAC's motion. R.K. contended that the court had again entered an impermissible order awarding equitable relief. And R.K. argued that because it could not mitigate the coercive fine and award of attorney fees and costs, this was a final, appealable contempt order. We overruled SFAC's motion, subject to reconsideration upon submission of the case on the merits.

III. ASSIGNMENTS OF ERROR
R.K. assigns, condensed and restated, that the district court erred in (1) finding that R.K.'s willful disobedience of the court's 1990 injunction order had been established beyond a reasonable doubt; (2) finding that Kreikemeier had admitted that R.K. violated the order; (3) ignoring SFAC's expert witness' testimony at the preliminary injunction hearing and a 2002 deposition; and (4) failing to find that exhibit 43, a diagram used by SFAC's expert witness, is the correct depiction of SFAC's *858 trade secret protected by the court's permanent injunction.
On cross-appeal, SFAC assigns two errors: (1) the court erred in failing to award it the full amount of its requested attorney fees and costs; and (2) the court erred in failing to rule that its January 2008 order was the law of the case or res judicata on the factual issue that R.K.'s grinding method violated the injunction.
As noted, however, SFAC moved to dismiss this appeal for lack of a final order. An appellate court lacks jurisdiction to entertain appeals from nonfinal orders.[5] So, before reaching the substantive issues raised by R.K.'s assignments of error, we determine whether we have jurisdiction.

IV. ANALYSIS

1. JURISDICTION

(a) Parties' Contentions
SFAC contends that the court's November 2008 contempt order is not a final order because it imposed civil, coercive sanctions. Relying on our 2006 opinion in Smeal I, it argues that contempt orders imposing civil, coercive sanctions are always nonfinal orders, which a contemnor can only attack through habeas corpus proceedings.
R.K. disagrees. It contends that the order is final under our decisions in Dunning v. Tallman[6] and State ex rel. Kandt v. North Platte Baptist Church.[7] In Smeal I, we relied on our decision in Dunning to hold that the trial court lacked jurisdiction to grant equitable relief. R.K. argues that the trial court has again required it to comply with a purge condition that granted SFAC equitable relief. It implicitly argues that the court lacked jurisdiction to enter this order. In addition, R.K. argues that under State ex rel. Kandt, we will review a contempt order after the trial court imposes a fine on the contemnor that cannot be mitigated. R.K. attempts to distinguish the district court's 2003 order that imposed contempt sanctions and was appealed in Smeal I. It contends that in Smeal I, we concluded that the 2003 order was a nonfinal order because it attempted to grant equitable relief to SFAC with no consequence for noncompliance. R.K. argues that in contrast to the 2003 order, the court's 2008 order imposes a sanction for its failure to comply with its purge planÔÇöand so there is a final order.

(b) Standard of Review
A jurisdictional issue that does not involve a factual dispute presents a question of law, which we independently decide.[8]

(c) Scope of Court's Powers in a Contempt Proceeding
Before discussing whether this is a final, appealable order, we address R.K.'s argument that the court lacked jurisdiction to grant equitable relief to SFAC through its purge plan. Obviously, if the court lacked jurisdiction to enter this order, we must reverse the order and dismiss the appeal.
Woven into the fabric of our case law are rules prohibiting both compensatory and equitable relief to a party injured by a contemnor's violation of a court's order or judgment. As noted, we relied on Dunning in Smeal I to conclude that the trial court lacked jurisdiction to impose its first purge plan and had therefore entered an *859 extrajudicial award of equitable relief. The rule against granting equitable relief emerged from our rule that a court cannot grant compensatory relief to an injured party in a contempt proceeding. But these rules have put trial courts in a judicial straightjacket and impeded their inherent authority to remedy a civil contempt. So, while we do not agree with R.K. that the court's purge plan on remand again granted equitable relief to SFAC, we conclude that R.K.'s argument raises a broader jurisdictional problem.
We believe our rule that courts lack jurisdiction to grant compensatory or equitable relief in a contempt proceeding to enforce an injunction is contrary to Neb. Rev.Stat.  25-1072 (Reissue 2008). It also conflicts with a court's inherent contempt powers. In overlooking  25-1072, we have sowed confusion regarding a court's contempt powers.
The Legislature has not amended  25-1072 since 1929. The statute sets forth the relief that a court may order for a party's contempt of an injunction:
An injunction granted by a judge may be enforced as the act of the court. Disobedience of an injunction may be punished as a contempt by the court.... [A] party guilty of [contempt] may be required, in the discretion of the court or judge, to pay a fine not exceeding two hundred dollars, for the use of the county, to make immediate restitution to the party injured, and give further security to obey the injunction; or, in default thereof, he may be committed to close custody, until he shall fully comply with such requirements, or be otherwise legally discharged.

(i) Our Rule Prohibiting Compensatory Relief
Our decision in Dunning, prohibiting a court's grant of equitable relief in a contempt proceeding, has its roots in Kasparek v. May.[9] So, we first discuss our prohibition against compensatory relief. In Kasparek, we excluded indemnity for damages from the relief a court can order for contempt of an injunction. Kasparek dealt with a contemnor's violating a permanent injunction. The injunction enjoined him from maintaining a dike and required him to remove it or to lower it and build a drainage ditch around it. In addition to enforcing the injunction, the adjacent landowner sought damages. We rejected damages as a remedy. We stated that we did not agree with jurisdictions holding that in contempt proceedings "a fine may be imposed for the indemnification of the person who has been damaged by the failure to perform."[10] We held that civil contempt is available to enforce a previous judgment, but not to afford a remedy for subsequent damages: "If [the adjacent landowner] suffered further damages, his remedy is an action at law for the subsequent damage."[11] But we did not cite or discuss  25-1072.
And, in Kasparek, we did not cite to any cases from other jurisdictions. But other state courts that prohibit compensatory fines in contempt proceedings generally rely on the language of their governing state statutes.[12] Some of these courts have reasoned that compensatory fines award damages without giving the contemnor the right to a jury trial.[13] Other courts, like this court in Kasparek, have *860 reasoned that the purpose of civil contempt sanctions is only to compel obedience to a past order. They conclude that requiring the contemnor to pay money damages to the injured party is inconsistent with that purpose.[14]
But these reasons conflict with  25-1072. It plainly states that a trial court may order a contemnor to "make immediate restitution to the party injured" for violation of an injunction. So,  25-1072 is consistent with what we have stated about the remedial purpose of civil contempt proceedings.
Civil contempt proceedings are "`instituted to preserve and enforce the rights of private parties to the suit and to compel obedience to orders and decrees made to enforce the rights and to administer the remedies to which the court has found them to be entitled....'"[15] Civil contempt proceedings are remedial and coercive in their nature.[16] "`If it is for civil contempt[,] the punishment is remedial, and for the benefit of the complainant.'"[17] Remedying the complainant's injury for a contemnor's disobedience clearly protects and enforces the complainant's rights under the original order or judgment. So, our holding in Kasparek that excluded compensatory relief thwarted a primary purpose for initiating civil contempt proceedings.
Moreover, we have recognized that restitution can serve the remedial purpose of compensating an injured party. It is true that restitution, strictly speaking, normally refers to restoration of an economic benefit; it can also refer to a money substitution for an economic benefit that the defendant unjustly obtained at the plaintiff's expense.[18] So, the measurement of restitution is normally a defendant's unjust gain and may exceed money damages, which are generally measured by a plaintiff's loss.[19] But under a juvenile restitution statute, we have stated that restitution generally "encompasses the `[r]eturn or restoration of some specific thing to its rightful owner' or `[c]ompensation for loss.'"[20] And under a criminal restitution statute, we have stated that restitution is remedial when it is limited to the injured party's actual losses.[21] Other courts with statutes identical to  25-1072 have similarly concluded that restitution under that state's statute includes compensatory relief for a plaintiff's loss or injury.[22] We agree. *861 Under  25-1072, it serves no purpose to impose a technical understanding of the term "restitution." The Legislature clearly intended "restitution" under this statute to compensate a complainant's loss or injury caused by a party's violation of an injunction.[23]
Finally, a contemnor is not denied a right to a jury trial by an award of compensatory relief under  25-1072. There is no constitutional right to a jury trial in a contempt proceeding when the court awards compensatory relief.[24] And under Nebraska law, parties generally do not have a right to a jury trial in actions or proceedings which have as their main object equitable relief.[25] Also, a court properly exercising equity jurisdiction may completely adjudicate all matters properly presented and grant relief, legal or equitable, as may be required and thus avoid unnecessary litigation.[26]
An action for an injunction is equitable in nature.[27] And a contempt proceeding to protect and enforce parties' private rights under an injunction is treated as supplemental to and of the same nature as the main action.[28] It is true that "[r]estitution claims for money are usually claims `at law,'"[29] which could be resolved without resort to equity.[30] But when a party has properly invoked the court's equity jurisdiction in a contempt proceeding, the court may resolve all related matters presented to it.
In sum, the reasons other courts have given for precluding compensatory relief in contempt proceedings do not apply under  25-1072. Nor was our decision in Kasparek consistent with  25-1072's specific grant of the power to order restitution in a contempt proceeding to enforce an injunction. Although  25-1072 is limited to remedies for violating an injunctive decree, our holding in Kasparek applies to any civil contempt proceeding. And the holding in Kasparek clashes with a court's inherent power in civil contempt proceedings to take necessary actions to enforce its order and administer justice.

(ii) A Court Has Inherent Power to Remedy Violations of Its Orders
Before we decided Kasparek, we had held that  25-1072 cannot limit a district court's inherent power to punish for contempt of its orders: "[T]he power to punish for contempt of court is a power inherent in all courts of general jurisdiction,... independent of any special or express grant of statute."[31] In State ex rel. Beck v. Frontier Airlines,[32] the contemnor *862 argued that the district court lacked authority to impose a fine above the $200 specified in  25-1072. We rejected that argument and affirmed the court's $1,000 fine for each day of a specified period that the defendant violated the court's injunction.
We have stated that a court that has jurisdiction to issue an order also has the power to enforce it.[33] A court can issue orders that are necessary to carry its judgment or decree into effect.[34] Nebraska courts, through their inherent judicial power, have the authority to do all things reasonably necessary for the proper administration of justice.[35] And this authority exists apart from any statutory grant of authority. We have recently explained that the power to punish for contempt is incident to every judicial tribune. It is derived from a court's constitutional power, without any expressed statutory aid, and is inherent in all courts of record.[36]
Similarly, federal courts and other state courts hold that courts of general jurisdiction have broad remedial power to enforce their orders, judgments, or decrees.[37] "The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief."[38] So, we hold that compensatory relief that is limited to a complainant's actual losses sustained because of a contemnor's willful contempt is remedial and is not prohibited in a civil contempt proceeding. Accordingly, we overrule Kasparek v. May[39] to the extent that it prohibits compensatory relief in a contempt proceeding.

(iii) Courts Are Not Prohibited From Granting Any Equitable Relief for Contempt
R.K. argues that under our decision in Dunning,[40] a court does not have jurisdiction to grant equitable relief to remedy a civil contempt.
In Dunning, we relied solely on Kasparek to hold that a court lacks jurisdiction to order equitable relief in a civil contempt proceeding. In Dunning, the contemnor violated a noncompetition agreement. The agreement was part of the parties' property settlement agreement and incorporated into the marital dissolution decree. The complainant asked the court to extend the noncompetition agreement as a sanction for the contempt. The court fined the contemnor $20,000 for her contempt, but its purge plan permitted her to avoid the fine by complying with the noncompetition agreement for an additional year. When she refused, the court made the fine unconditional.
On appeal, we stated that a court cannot impose punitive fines in civil contempt proceedings. *863 But we reasoned that the fine was not necessarily a punitive sanction for contempt if it permissibly coerced compliance with the extended duration of the noncompetition agreement. And we recognized that in actions for injunctions, other courts had used their equitable powers to extend the duration of noncompetition agreements equal to the duration of the breach. But we concluded that the requested relief ÔÇö an extension of a noncompetition agreement ÔÇö was not allowable in a civil contempt proceeding. We determined that it was analogous to the damages requested in Kasparek: "Because an award of damages is unavailable in a civil contempt proceeding, ... then, under the Kasparek rationale, a civil contempt proceeding cannot be the means to afford equitable relief to a party."[41] More specifically, we held that in imposing a sanction for civil contempt, a court cannot use, as a requisite to purge contempt, a condition that affords equitable relief to a party.[42] We further held that "the trial court lacked jurisdiction or power to require that [the contemnor] comply with the judicially extended noncompetition provision as a means to avoid the $20,000 fine."[43]
Yet, like our holding in Kasparek, our holding in Dunning is inconsistent with a court's inherent power to enforce its orders. Our holding in Dunning sprouted from Kasparek, which we have now overruled as an improper limitation on a court's remedial powers for violations of its orders or judgments. So, our prohibition against equitable relief has unnecessarily choked our contempt jurisprudence. Accordingly, we also overrule the prohibition in Dunning v. Tallman[44] against a court's granting any equitable relief in a contempt proceeding.

(iv) Restrictions on Court's Power to Order Equitable Relief for Contempt
Like injunctions, both an original marital dissolution proceeding and proceedings for modification of dissolution decrees are equitable in nature.[45] We permit a party to use contempt proceedings to enforce a property settlement agreement incorporated into a divorce decree.[46] And a district court, in exercising its broad jurisdiction over marriage dissolutions, retains jurisdiction to enforce all terms of approved property settlement agreements.[47] Because of the court's continuing equity jurisdiction over the decree, the power to provide equitable relief in a contempt proceeding is particularly appropriate.[48]
But there are limits to a court's power to order equitable relief in a contempt proceeding. We have held that a court cannot modify a dissolution decree in a contempt proceeding absent an application for a modification and notice that a party seeks modification.[49] Similarly, parties must have notice and a hearing before *864 a court modifies a permanent injunction.[50] So, if a complainant seeks, or a court is considering, a modification of the underlying decree as an equitable sanction for contempt of the court's decree, the alleged contemnor must first have notice that a modification and a finding of contempt will be at issue.
But when the alleged contemnor has notice and an opportunity to be heard, a court can modify the underlying decree as a remedy for contempt if the violation cannot be adequately remedied otherwise.
Having determined that a court has jurisdiction to order compensatory and equitable relief, we now consider whether the court's order of civil sanctions was appealable.

(d) Existing Nebraska Case Law Prohibits a Contemnor's Appeal From a Civil Contempt Order
We have held that a contemnor cannot appeal a contempt order if it imposes a civil, coercive sanction.[51] In Smeal I, we repeated this rule and noted that the rule's origin was our 1984 decision in In re Contempt of Liles (Liles).[52] After Liles, both this court and the Nebraska Court of Appeals have stated in many other cases that contempt orders imposing civil sanctions are not final, appealable orders or that such orders can be attacked only through a habeas corpus proceeding.[53]
All but one of our later cases involved a final contempt order from a postjudgment proceeding to enforce a previous final judgment. And whether we reviewed those contempt orders hinged upon whether the trial court's sanction was civil or criminal. We would review orders imposing criminal sanctions but not orders imposing civil sanctions.
In general, civil contempt sanctions are remedial if they coerce the contemnor's obedience for the benefit of a private party or compensate a complainant for losses sustained.[54] As we have often stated, a coercive contempt sanction is conditioned upon the contemnor's continued noncompliance with a court order; i.e., the defendant is in a position to mitigate the sentence by complying with the court's order.[55] In contrast, criminal contempt sanctions are punitive. They vindicate the court's authority and cannot be ended by any act of the contemnor.[56]
As we know, a critical distinction exists between civil and criminal sanctions: *865 A court can impose criminal, or punitive, sanctions only if the proceedings afford the protections offered in a criminal proceeding.[57] Another distinction relates to appeals. A contemnor can always appeal from a criminal contempt order.[58] But the issue here is whether a party can appeal from a civil contempt order. In Liles, we misread federal case law on this issue. And, unfortunately, Liles and its progeny have spawned considerable confusion. To clear the confusion, we look to federal rules for when a contemnor can appeal a civil contempt order.

(i) Federal Rules Permit a Party's Appeal From a Final Contempt Judgment
The U.S. Supreme Court has held that federal appellate courts cannot review a party's appeal from a trial court's interlocutory contempt order. Appellate courts can only review final contempt judgments. And a contempt order issued before a final decree in the main action is only final if it imposes a criminal sanction to vindicate the court's authority.[59] Accordingly, federal appellate courts will review interlocutory contempt orders against parties only in a party's appeal from the final decree or judgment.[60] For example, if a party failed to comply with a discovery ruling, the trial court's contempt order would constitute an interlocutory contempt order that was unreviewable by an appellate court except as part of the party's appeal from the trial court's final judgment.
Federal courts apply the same rule to contempt orders issued during supplemental postjudgment proceedings still in progress; parties must seek review of such orders as part of their appeal from the final judgment.[61] The only appeals that the U.S. Supreme Court has permitted from interlocutory, civil contempt orders are nonparty appeals. This exception exists because nonparties could never obtain review of such orders.[62] But most federal appellate courts have explicitly held that a final contempt judgment from a postjudgment contempt proceeding to enforce a previous final judgment is appealable.[63] Under federal case law, the distinction between criminal or civil sanctions has no relevance to exercising appellate jurisdiction over a final judgment from a postjudgment contempt proceeding.[64] And the right of appeal from a postjudgment contempt order does not depend upon whether the trial court has made a final assessment of fines when coercive fines were the civil sanction.[65] It is true we have stated *866 that "[c]ivil contempt orders are treated as interlocutory ...."[66] But like our holding in Liles, that statement went too far because only civil contempt orders issued before a final judgment in the main action are interlocutory.

(ii) Liles Was Incorrectly Decided

In Liles, the trial court had ordered the contemnor jailed for refusing to testify at a show cause hearing for his past contempt of an injunction. We had previously denied his habeas corpus petition and were considering his motion for a stay of his jail sentence pending his appeal. We denied the motion because we concluded that a civil contempt order is not appealable. We stated that "punitive sanctions are reviewable by appeal; whereas coercive sanctions can only be attacked collaterally by habeas corpus."[67]
But the rule we extracted from federal case law swept too broadly. We failed to distinguish between interlocutory civil contempt orders issued before the trial court's final judgment and a final contempt order imposed in a separate postjudgment proceeding to enforce a previous final judgment. Contrary to our decisions in earlier cases,[68] we implied that a party could never appeal a contempt order imposing a coercive sanction. And, as noted, we have reviewed or rejected appeals in several cases involving appeals from postjudgment contempt orders based on whether the sanction was civil or criminal. But our case law is inconsistent with federal rules because the rule we set forth in Liles was too broad.
Moreover, Liles created needless obstacles to appellate review. Under our rule that civil contempt orders are non-appealable, we have obviously rarely reviewed the correctness of a trial court's finding of contempt unless the trial court has impermissibly imposed a criminal sanction in a civil proceeding.[69] And we have also held that the correctness of the contempt order is moot if the party complies with the purge plan to escape the coercive sanction of open-ended incarceration.[70] Finally, a habeas corpus proceeding is an illusory substitute for an appeal in most cases. As we stated in Smeal I, a habeas corpus proceeding applies only to persons illegally detained.[71] Habeas corpus generally does not apply to a coercive fine sanction.[72] And even when the contempt sanction is a coercive incarceration, attacking the order through a habeas corpus proceeding will usually be futile.[73] So, the combination of these rules have unintentionally but effectively choked off a contemnor's right to appeal from a judgment of civil contempt.
Additionally, we have created procedural knots by hinging the right to appeal upon the character of the trial court's sanction. For example, in a second appeal from a contempt order, we held that a civil coercive sanction had changed to a criminal sanction after the trial court assessed total fines.[74] And we have inconsistently characterized the same sanction in separate cases as civil or criminal for exercising appellate jurisdiction and reviewing the contempt order.[75]
*867 In sum, hinging the right to appeal on a sanction's characterization has been a difficult rule to apply and at times inconsistent. More important, our rule has boxed contemnors into a minefield. They either face continuing coercive sanctions or risk a court's determination that the issue is moot because they complied with the purge plan. We conclude that our holding in Liles that any civil contempt order is nonappealable was manifestly wrong. The rule is unworkable for final contempt orders entered in a separate postjudgment proceeding to enforce a previous final judgment.
Although we agree with federal courts that final, postjudgment contempt orders should be appealable, we disagree with the characterization of these orders as "final judgments." We believe that this characterization is inconsistent with treating a civil contempt proceeding as supplemental to the main action.[76] Under Neb. Rev.Stat.  25-1902 (Reissue 2008), we have stated that an order on "`summary application in an action after judgment'" is an order ruling on a postjudgment motion in an action.[77] We conclude that under Nebraska law, an order of contempt in a postjudgment proceeding to enforce a previous final judgment is more properly classified as a final order; the contempt order affects a substantial right, made upon a summary application in an action after judgment.[78]
For appeal purposes, we hold that the distinction between criminal and civil contempt sanctions has no relevance to whether a party may appeal from a final order in a supplemental postjudgment contempt proceeding.
We now overrule any cases that could be interpreted as holding that a final civil contempt order from a postjudgment proceeding is nonappealable and may only be attacked through a habeas corpus proceeding. Specifically, we overrule Liles[79] and all the cases listed in footnote 53 to the extent that they hold or imply that contemnors can never appeal from a final order of civil contempt.

2. R.K.'S FAILURE TO APPEAL FROM THE COURT'S ORDER CLARIFYING THE INJUNCTION DOES NOT FORECLOSE OUR REVIEW OF THOSE FINDINGS
A provision of the injunction allowed R.K. to use "any commercially available hydraulic control valves or valve spools." On remand from Smeal I, R.K. moved for an order granting it permission to grind a commercially available valve spool. In January 2008, after an evidentiary hearing, the district court overruled that motion. It found that the valve spool R.K. proposed to use would no longer be a commercially available valve spool after R.K. modified it.
In its cross-appeal, SFAC argues that a party must seek the court's clarification if the party is in doubt of an ambiguous provision in an injunctive decree. SFAC focuses on our statements in Kasparek[80] and a 1981 case, Sprunk v. Ditter.[81] There, we said that if a party is uncertain what a court intended by its order, the party's remedy is to seek further advice and instructions from the trial *868 court. And if a party acts on his own interpretation, he does so at his peril.[82] So, SFAC contends that the court's clarification order was a final order affecting a substantial right. Because R.K. failed to appeal the order, SFAC claims those findings became the law of the case and are not subject to review by this court in this appeal. We disagree.
The law-of-the-case doctrine reflects the principle that an issue that has been litigated and decided in one stage of a case should not be relitigated at a later stage.[83] On appeal, however, the law-of-the-case doctrine is a rule of discretion, not jurisdiction.[84] And the doctrine requires a final order. A party is not bound by a court's findings in an order that it was not required to appeal.[85]
Our statement in Kasparek that a party should seek a clarification of an unclear injunctive decree mirrors a statement made by the U.S. Supreme Court. In McComb v. Jacksonville Paper Co.,[86] the Court framed the issue as follows: "Respondents could have petitioned the District Court for a modification, clarification or construction of the order.... But respondents did not take that course either. They undertook to make their own determination of what the decree meant. They knew they acted at their peril." In holding that courts have jurisdiction to interpret their own injunctions, the Court has reasoned that courts of equity have continuing jurisdiction to interpret their orders.[87]
This court has similarly stated that district courts have equity power under the Nebraska Constitution to grant permanent injunctions. And that power cannot be abridged by statute.[88] A district court's constitutional equity power enables a court to have continuing jurisdiction in any succeeding term over a permanent injunction.[89]
It is true that we have previously held that a party to a final marital dissolution decree cannot ask a court to interpret the decree other than through a modification or a contempt proceeding.[90] But the decree at issue in the marital dissolution case failed to distribute some of the parties' marital property.[91] Here, however, we are not dealing with a material omission in the injunctive decree ÔÇö the correction of which would require a modification. Instead, R.K. sought a clarification of the court's injunctive decree.
In sum, we agree with federal courts that a court of equity has the power to interpret its own injunctive decree if a party later claims that a provision is unclear.[92] But permitting a party to seek clarification of an injunction is not the *869 same as requiring a party to do so. Instead, the critical question for appeal purposes is whether the clarification order merely interprets the decree or whether it modifies the decree in a way that affects a party's substantial right. We find guidance in federal cases.
A federal statute permits parties to appeal from interlocutory orders modifying an injunction or denying a modification.[93] But federal courts do not permit parties to appeal from orders interpreting or clarifying an injunction.[94] They have distinguished modifications and clarifications by looking to the substantive effect of the order instead of the parties' or court's characterization. Several federal appellate courts have adopted a version of the following test: If the order only restates the parties' legal relationship without changing the original relationship, relaxing any prohibitions, or imposing any new obligations, it is a mere interpretation that cannot be appealed.[95]
Nebraska does not have a comparable interlocutory appeal statute. But we have stated that a court cannot, in interpreting an injunctive decree, expand the terms of a previous order or judgment beyond a reasonable interpretation in the light of its purpose.[96] So, we believe that whether an order implementing or interpreting an injunction alters the parties' relationship is also a valid test for determining whether the order affects a substantial right under  25-1902. Therefore, we hold that a court's order clarifying a permanent injunction is a final order only if it changes the parties' legal relationship by expanding or relaxing the terms, dissolving the injunction, or granting additional injunctive relief.
R.K. asked the court to determine whether the injunction permitted its proposed grinding of a commercial valve spool. The court's order clarified that the injunction prohibited R.K.'s proposed modification. SFAC obviously does not claim that the order overruling R.K.'s request to modify a commercially available valve spool expanded the decree's terms in a way that granted additional injunctive relief to SFAC. We conclude that R.K.'s failure to appeal from the January 2008 order does not foreclose review of the court's later findings in the contempt proceeding.

3. DISTRICT COURT ERRED IN FINDING R.K. WILLFULLY VIOLATED THE PERMANENT INJUNCTION
Having disposed of the jurisdictional issues and the law-of-the-case doctrine, we come to the merits of R.K.'s appeal. R.K. contends that the district court erred in finding that SFAC had proved beyond a reasonable doubt that R.K. willfully violated the injunction. R.K. argues that it modified the part of its valve spool that opens the pressure side of the control valve, not the part that opens the tank side; R.K. contends that injunction did not prohibit it from modifying the pressure side of its valve spools.

*870 (a) Additional Facts
As we will explain later, we conclude that the key terms in the injunction were ambiguous as to whether they prohibited R.K.'s conduct complained of in the contempt proceedings. Understanding that ambiguity and what the injunction was intended to prohibit requires that we delve into an aerial ladder's hydraulic systems.

(i) Hydraulic Basics
As noted, SFAC's disputed trade secret involves a hydraulic valve spool. SFAC and R.K. use hydraulic systems to move their aerial ladders. Oversimplified, the hydraulic systems create power to move the ladders by moving hydraulic fluid through a control valve. The control valves have four openings called ports. A pump moves pressurized hydraulic fluid ÔÇö in this case oil ÔÇö from a reservoir tank through a line connected to the valve's pressure port. The valve directs the pressurized fluid to a work port, A or B. Both work ports have lines connected to a hydraulic cylinder that controls a particular ladder movement. In a hoist cylinder system, for example, if the fluid in the valve is directed to the A work port, it will pass through a line to the part of the cylinder that pushes the fluid against a piston in a way that raises the ladder and holds it up. At the same time, fluid is returning to the valve through the line connected to the B work port. That fluid is directed to the tank port of the valve, which has a return line to the reservoir tank. The returning fluid is redirected to the control valve, creating a circuitry.
The flow in the valve is controlled by a hydraulic valve spool, which is a movable, cylinder part in the valve. The valve spools are machined so that depending on how they are moved, they open the pressure and tank ports and direct the flow of hydraulic fluid to the A or B work ports. As we understand the parties' testimony and briefs, they have referred to the part of a valve spool that opens the pressure side (or pump side) of the control valve as the corresponding "pump side" or "pressure side" of the valve spool. And they have referred to the part of the valve spool that opens the tank side of the valve as the "tank side" or "return side" of the valve spool. For convenience, we shall also refer to the pressure side and tank side of the valve spool to mean the part of the valve spool that opens the corresponding pressure or tank port of the valve.
A common problem with hydraulic systems is pressure surges, which occur because there is a burst of fluid through the system when the valve is opened. The surge creates oscillations in the system until the pressure settles back into a constant pressure. In aerial ladders, the oscillations transfer to the ladder, causing jerky movements and making control of the ladder difficult. While Kreikemeier worked for SFAC, SFAC developed a modification for its valve spools to dissipate these pressure surges.
With that background, we are asked to decide whether the court correctly found that R.K.'s 1996 modification of the pressure side of its commercially available valve spools violated the 1990 injunction.

(ii) Prohibited Conduct Under the Injunctions
Both the 1989 preliminary injunction and the 1990 permanent injunction prohibited R.K. from disclosing or using a "surge free control valve created by grinding or milling the valve spool so as to create an unbalanced control spool which converts the tank side of a hydraulic cylinder to a fluid damper which dissipates pressure surges."
In determining whether a party is in contempt of an order, a court may not expand an earlier order's prohibitory or mandatory language beyond a reasonable *871 interpretation considering the purposes for which the order was entered.[97] We recognize that contract principles generally apply to the enforcement of consent decrees. And these principles prohibit a court from considering extrinsic evidence of the decree's meaning absent some ambiguity.[98] But here, both parties disputed the meaning of key technical terms in the injunction: "unbalanced control spool" and "fluid damper." Because of their different definitions of these terms, they argued that the injunction prohibited different conduct. The Court of Appeals, in a 2004 unpublished opinion involving these parties, determined that both of these terms were ambiguous as a matter of law. It stated that the terms could be fairly interpreted in more than one way.[99] We agree, as we will discuss further in the analysis section. Because of this ambiguity, the district court on remand from Smeal I[100] judicially noticed the testimony of SFAC's hydraulic expert at the preliminary injunction hearing, the expert's 2002 deposition, and the transcript of the preliminary injunction hearing. We similarly conclude that reviewing the previous injunction proceedings is crucial to understanding the injunction's purpose.

(iii) 1989 Preliminary Injunction Hearing
In February 1989, the court heard the preliminary injunction. This was 8 months after Kreikemeier signed a contract to build aerial ladders for another manufacturer referred to in the record as "Maxim," one of SFAC's competitors.
Delwin Smeal testified that as SFAC incorporated other components into its hydraulic system, Smeal realized that SFAC needed to modify its valve spool to deal with jerkiness in the ladder's operation. In 1977, after considerable trial and error, he discovered how to mill a valve spool to get a smoother hydraulic operation for SFAC's aerial ladders. About 1983, the modification process was refined, using commercially available valve spools.
Kreikemeier started working at SFAC in 1977. Smeal stated that Kreikemeier began working on SFAC's aerial ladder hydraulics in 1982 and that he taught Kreikemeier how to mill SFAC's valve spools. In 1984, SFAC began selling its ladders to Pierce Manufacturing Company (Pierce), a company that produced finished firetrucks but did not manufacture aerial ladders. At some point, Maxim also asked SFAC to sell its aerial ladders to Maxim. Because Maxim was a competitor, SFAC declined. SFAC suspected that Maxim wanted only to "reverse engineer" SFAC's ladder, causing SFAC to lose its competitive advantage. After SFAC declined this offer, a representative from Maxim contacted Kreikemeier about him either working for Maxim or building ladders for Maxim. The Maxim representative had previously worked for Pierce and had become familiar with Kreikemeier during that time. At some point, Kreikemeier told Maxim that he was not interested in working for it; he stated that he wanted *872 to start his own company. When he did not break off his negotiations with Maxim, SFAC terminated his employment in May 1988. In June 1988, Kreikemeier signed a contract to build aerial ladders for Maxim.
Kreikemeier knew SFAC's entire manufacturing process because he had been the assistant manager of the aerial ladder division before SFAC terminated his employment. Before leaving SFAC, Kreikemeier admitted to Smeal that he planned to use SFAC's hydraulic system.
Kreikemeier admitted that when he left SFAC, he took copies of SFAC's plans, structural designs, and everything written down on paper about SFAC's ladder, including SFAC's modification of its valve spools. He stated that he did not take the documents to duplicate SFAC's ladder but admitted that he referred to them in designing his ladder. He also admitted that he did not produce the SFAC documents in response to the court's document production order. And he burned SFAC's documents just before the preliminary injunction hearing. He specifically admitted to using SFAC's grinding method to modify the valve spools in the hydraulic valves for R.K.'s outrigger jacks, which stabilize the truck when the aerial ladder is in use. But the evidence did not show that R.K. was grinding the valve spools in its hydraulic system for raising or lowering an aerial ladder.
Smeal testified that SFAC's trade secret was multifaceted. He was asked whether his modification of the valve spool represented all of the confidential information and trade secrets that SFAC possessed regarding its aerial ladders. He denied that characterization. Smeal stated that SFAC also added components to the lines between the valve and the cylinder and that neither the external components nor the valve spool modification would work unless they were coordinated. But he admitted that the external components were commercially available and that SFAC did not make any changes to the control valve other than to modify the valve spool. He stated that SFAC cut its valve spools to advance the flow from the pressure line to the work port and from the work port to the tank line. He also stated that SFAC dissipated "unwanted build-up pressure inbetween... valves and cylinders ... [b]y cutting the spool." But Smeal did not identify any specific cuts or modifications that SFAC made to its valve spools.
The only witness to identify SFAC's valve spool modification was its hydraulic expert, Wayne Whaley, Ph.D. Whaley believed that SFAC's valve spool modification was unique and superior to other methods for dissipating pressure surges because it permitted the pressure in the valve to remain constant, relative to the flow of the fluid and the position of the valve spool. He stated that SFAC had achieved constant pressure by effectively creating a fluid damper on both lines leading to the cylinder.
According to Whaley, SFAC had created its constant pressure circuitry system out of standard hydraulic components. He explained that SFAC had done this by "creating an orifice opening in the region of the tank spool": i.e., by modifying "the portion of the valve spooling that returns fluids back to the tank." More important to our resolution, he stated that the only cuts SFAC made were on "that part of the spool where the flow returns to the tank" and that the pressure side of its valve spool was not changed.
Whaley explained that this unbalanced modification converted the tank side of the cylinder into a fluid damper "by creating this small orifice that begins to open before the pressure side, the pump side of the flow goes to the other side of the cylinder." Or, as he explained in a 2002 deposition, the tank side of the control *873 valve is opened a little before the pressure side is opened to leak out some of the fluid. This modification greatly minimized the pressure surges that go through the system when a valve opens or closes.
Using the information that Smeal gave him, Whaley also created a diagram of SFAC's valve with the spool modification. Whaley had never seen a valve like SFAC's before, and he believed it was patentable. Whaley titled the diagram "An Ideal Linear Control Valve." In response to the court's questions, Whaley specifically stated that this diagram showed SFAC's spool alteration. He stated that all hydraulic valve spools were capable of being modified in this manner and that the modification could be easily done by any skilled craftsman who knew the secret: how to modify the tank side of the valve spool to create a fluid damper. (As noted, the focus of the trade secret in Whaley's testimony was an orifice on the tank side of the valve spool that leaked fluid back to the reservoir tank.)
The court received into evidence a document providing Whaley's opinion of SFAC's trade secret as illustrated by his diagram. In the document, he stated that SFAC
has clearly invented a new surge-free control valve not available from any other source and not known in the fluid power control industry. [SFAC's] surge-free valve utilizes an unbalanced control spool which converts the tank side of a hydraulic cylinder to a fluid damper which dissipates pressure surges.
(Emphasis supplied.) He further stated that SFAC's "surge-free control valve in combination with any compensation circuit may also be a trade secret." But he stated that he would need to do more patent research before making that conclusion.
In March 1989, the court issued the preliminary injunction. The court incorporated Whaley's above description of SFAC's trade secret as the manufacturing process that R.K. was prohibited from revealing or using. There were no further hearings.
In June 1990, the court issued a permanent injunction upon the parties' settlement agreement. It is true that Smeal had testified that SFAC cut its valve spool to advance flow from the pressure port to the work port and from the work port to the tank port. But the agreed-upon injunction did not prohibit R.K. from modifying its valve spools on the pressure side or from modifying its valve spools to increase flow from the pressure port to the work port. Instead, the permanent injunction's prohibition was identical to the preliminary injunction. It prohibited R.K. from using an unbalanced control spool to convert the tank side of a hydraulic cylinder to a fluid damper to dissipate pressure surges.

(iv) 2002 Contempt Proceedings
The evidence at the first contempt proceeding established that in 1996, R.K. began making the modification to its valve spools to correct oscillation problems in the lowering of its ladder. To correct the problem, R.K. removed metal in two places from the pressure side of its valve spools that controlled a ladder's up-and-down motion. Smeal testified that R.K.'s modification of its valve spools was the same as the modification that SFAC made to the pressure side of its valve spools to avoid these oscillations. He stated that SFAC was grinding its valve spools in this manner while Kreikemeier worked at SFAC and that Kreikemeier had sketched the way SFAC modified its valve spools while working there. But the modification that SFAC made to the pressure side of its valve spools addressed a different problem and had a different effect than the modification that it made to the tank side of the spool. Smeal stated that when the ladder *874 was moving down, unless the pressure side was modified to increase the volume of oil flowing into the work port, opening the tank port would cause a pressure drop that created a "shock wave" and produced oscillations.
Smeal admitted that R.K.'s commercially available valve spool would slightly open the tank port of the valve before opening the pressure port without any modification. He admitted that R.K. removed metal from only the pressure side of its valve spools and not the tank side. Smeal also admitted that Whaley had prepared the language that described Smeal's trade secret, which language was in both the preliminary and the permanent injunction. And he admitted that the injunction was a description of the trade secret Smeal was trying to protect in 1989.
But Smeal denied that valve spools which slightly opened the tank port before the pressure port were "unbalanced," as defined in the injunction. Instead, he defined "unbalanced" to mean that the valve spool would allow a higher volume of oil to flow in through the pressure port than the returning fluid that flowed out of the valve. And he stated that this unbalanced flow used the tank side of the hydraulic cylinder as a fluid damper.
Smeal also denied that exhibit 43, which was Whaley's diagram from the preliminary injunction hearing, represented any part of SFAC's trade secret that was protected by the injunction. He stated that Whaley was "mixed up" about SFAC's trade secret and that no diagram or picture at the preliminary injunction reflected SFAC's trade secret. The court sustained a relevancy objection to exhibit 43.
After the hearings, the court also sustained relevancy and hearsay objections to exhibit 54, which was the transcript of the 1989 preliminary injunction hearing. And it sustained a relevancy objection to exhibit 53, which was a 2002 deposition of Whaley. The court stated that Whaley's testimony was based on exhibit 43, his diagram, which was irrelevant. So it concluded that Whaley's testimony based on his diagram did not assist the court in understanding the evidence or determining the facts at issue. In sum, the court refused to look at any evidence from the preliminary injunction hearing or Whaley's 2002 deposition. As noted, however, the Court of Appeals later determined that key terms in the injunction were ambiguous.
In June 2002, the court found R.K. was willfully in contempt of the permanent injunction. In reaching this conclusion, the court concluded that the injunction was unambiguous, but the court defined two terms of the injunction. It defined an "unbalanced spool" as a valve spool that allows hydraulic fluid to flow at an uneven rate or different rate of flow through either port. It defined a "fluid damper" as an "orifice or metering notch."
The court stated that Kreikemeier had admitted that since 1996, R.K. had been grinding its valve spools on the pressure side to allow the hydraulic fluid to flow through the pressure port before the fluid could exit the tank port. It concluded that whether the injunction protected Smeal's trade secret was irrelevant to whether R.K. had violated the injunction. It found that R.K.'s grinding of its valve spools violated the injunction because it resulted in the surge-free control valve that was prohibited by the injunction. It further found that R.K.'s violation was willful and intentional, with knowledge that its acts violated the injunction. This order was the subject of Smeal I, but we did not reach the substantive merits of the court's order.

(v) R.K.'s 2008 Motion for Permission to Modify a Commercially Available Valve Spool
We issued our decision in Smeal I in *875 May 2006.[101] In June, R.K. moved to dismiss the contempt action or to reopen the case for additional evidence. It relied on the Court of Appeals' opinion that key terms in the injunction were ambiguous as a matter of law. In September, R.K. filed a new motion for permission to modify a commercially available valve spool in a manner that would allow the pressure port to open before the tank port when the ladder was moving down. R.K. contended that its grinding would duplicate a commercially available valve spool.
At the hearings on the motion for permission to modify a commercially available valve spool, the court took judicial notice of Whaley's testimony from the 1989 preliminary injunction hearing; his 2002 deposition, taken between hearings in the 2002 contempt proceeding; and the transcript of the preliminary injunction hearing. The court stated that it was taking notice of this evidence because the Court of Appeals had concluded that the terms "unbalanced control spool" and "fluid damper" were ambiguous.
In Whaley's 2002 deposition, exhibit 53, he was asked about the diagram of an ideal control valve admitted at the preliminary injunction hearing. He reiterated his testimony from that hearing that SFAC created a fluid damper to dissipate power surges in its valve by grinding the tank side of its valve spool to make an orifice that gradually opened to the tank port. Whaley stated that the term "fluid damper" in his written explanation of SFAC's trade secret referred to the modification that opened the tank side of the valve first, thus permitting hydraulic oil to flow to the tank side first. And he stated that the term "unbalanced" referred to the timing difference between the tank side opening before the pressure side. He specifically stated that his description did not refer to a modification that caused the pressure port to open first.
After the hearing, the court found Smeal's evidence more credible and concluded that R.K. would not be using a commercially available spool if it permitted R.K.'s request to modify the spool.

(vi) Interpretation of This Court's Mandate
In April 2008, SFAC moved for a new contempt order with coercive sanctions consistent with this court's mandate and for attorney fees and costs. In Smeal I, we vacated "those aspects of the district court's order affording equitable relief to [SFAC and] the award of attorney fees and costs."[102] We did not vacate the court's finding of contempt.
In May 2008, the court heard arguments on SFAC's contempt motion and R.K.'s motion to dismiss the contempt action or to reopen it. In response to R.K.'s motion, the court received all of the evidence that it had received at the hearing on R.K.'s permission to modify a commercially available valve spool. But it stated that because it no longer considered the terms of the injunction to be ambiguous, "the way is clear to enter the contempt order in this case." It interpreted our mandate in Smeal I as requiring it to reimpose a purge plan and directed counsel for SFAC to prepare a new contempt order. The only remaining issue was attorney fees.

(vii) 2008 Contempt Order
In November 2008, the court issued a new contempt order. It stated that it had reviewed all of the evidence it had received at the motion for permission to modify a commercially available valve spool. It again stated that this court's mandate required it to impose a purge plan that did *876 not grant equitable relief to Smeal. It explicitly adopted its findings from its order on the above motion. It stated that
since the manner by which [R.K.] sought to grind the valve spool ... used as an exemplar a valve spool ground in a manner that [was earlier] found to be in violation of the injunction, with the benefit of the prior rulings and the evidence and the testimony of January 2008, this court reaffirms [the first] finding of contempt.
To purge R.K.'s contempt, the court required R.K. to take steps to ensure its compliance. It required R.K. to hold a company meeting within 10 days. At the meeting, R.K. was required to present the court's order prohibiting the requested manufacturing process, as exemplified by exhibit 210, to the following people: current and future employees, officers, managers, stockholders, partners, and manufacturing agents. Exhibit 210 depicted R.K.'s modified valve spool.

(b) Standard of Review
An appellate court, reviewing a final judgment or order in a contempt proceeding, reviews for errors appearing on the record.[103] When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[104] A trial court's factual finding in a contempt proceeding will be upheld on appeal unless the finding is clearly erroneous.[105]

(c) Analysis
R.K. contends that the court ignored Whaley's testimony at the preliminary injunction and in his 2002 deposition. It further argues that the court erred when it failed to find that exhibit 43, which was Whaley's diagram, correctly depicted SFAC's trade secret protected by the court's permanent injunction.
When a party to an action fails to comply with a court order made for the benefit of the opposing party, such act is ordinarily a civil contempt, which requires willful disobedience as an essential element.[106] "Willful" means the violation was committed intentionally, with knowledge that the act violated the court order.[107] Under current Nebraska law, a party seeking to hold another in contempt of an order has the heavy burden of establishing that contempt beyond a reasonable doubt.[108]
The question at the contempt proceeding was not whether R.K. pirated SFAC's trade secrets. The question was whether R.K.'s alleged use of SFAC's trade secrets violated the parties' agreed-upon injunction order. Before proceeding to our analysis, we set forth some general principles that are helpful to the resolution of this appeal.
"Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed."[109] "The judicial *877 contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one.... [T]hose who must obey them will know what the court intends to require and what it means to forbid."[110] Understood in light of these principles, the "`four corners'" rule for interpreting consent decrees is intended to narrowly cabin the circumstances in which contempt may be found.[111] "It is because `[t]he consequences that attend the violation of a court order are potentially dire,' ... `that courts must "read court decrees to mean rather precisely what they say."'"[112] So a court cannot hold a person or party in contempt unless the order or consent decree gave clear warning that the conduct in question was required or proscribed.[113]
But injunctions protecting trade secrets may justify less specificity than other orders or decrees to avoid disclosing the plaintiff's trade secret.[114] For this reason, injunctions protecting trade secrets that raise ambiguities involving technical or scientific knowledge may require courts to review the context in which the injunction was entered. This allows the court to determine what conduct the defendant reasonably should have known was prohibited. Even in that circumstance, however, ambiguities that persist even when considered in the light of the record or after applying other aids of interpretation must be construed in favor of the person or party charged with contempt.[115]
We interpret the court's contempt order on remand to mean that the court concluded that it was not required to consider anew whether R.K.'s grinding of its valve spools violated the injunction. The court did not make any specific findings of fact. And although it judicially noticed the preliminary injunction and Whaley's deposition, it did not define the ambiguous terms of the injunction. Its earlier finding that R.K.'s proposed grinding would not result in a commercially available valve spool did not clarify matters.
The injunction was prohibitory, not mandatory. That is, the injunction specifically excluded from its prohibition R.K.'s use of any commercially available valve spool. That exclusion obviously did not mandate that R.K. use only commercially available valve spools. Instead, the injunction enjoined R.K. from using a "surge free control valve created by grinding or milling the valve spool so as to create an unbalanced control spool which converts the tank side of a hydraulic cylinder to a fluid damper which dissipates pressure surges." (Emphasis supplied.) It did not enjoin R.K. from modifying commercial valve spools in any manner.
But the court in its 2008 order did not find that R.K.'s proposed grinding of a valve spool would result in an unbalanced control spool which converted the tank *878 side of a hydraulic cylinder to a fluid damper to dissipate pressure surges. Instead, the court seems to have deferred to the earlier 2002 contempt order. But the 2002 contempt order is similarly flawed because the court refused to review the record of the preliminary injunction hearing to clarify ambiguities in the injunction.
Despite SFAC's claim that the injunction prohibited R.K. from modifying the pressure side of the valve spool, the injunction's language referred to converting the "tank side of a hydraulic cylinder" to a fluid damper. (Emphasis supplied.) In the face of R.K.'s claim that the injunction was not intended to apply to the modification to the pressure side of the valve spool, the inconsistency between SFAC's interpretation and the injunction was sufficient to create an ambiguity. So, during the first contempt proceeding, the court erred in concluding that the record from the preliminary injunction hearing was irrelevant. Had the court consulted that record, the ambiguity would have been resolved in R.K.'s favor.
The permanent injunction represented the parties' settlement agreement. And the record shows that they clearly agreed to prohibit R.K. from using SFAC's trade secret as described by Whaley. Whaley's description of using a valve spool to convert the tank side of a hydraulic cylinder into a fluid damper was unequivocally explained as making cuts on the tank side of the valve spool, with no modification to the pressure side of the valve spool. He specifically stated that SFAC's grinding permitted the tank side to open before the pressure side to dissipate pressure surges.
What SFAC has tried to do is to make R.K.'s grinding on the pressure side of its valve spool fit the language of the injunction. It doesn't fit. We recognize that the record shows that Smeal considered SFAC's trade secret to be more than Whaley's description, and he later denied that Whaley's diagram of SFAC's trade secret had depicted any part of SFAC's trade secret. But the issue in a contempt proceeding is what conduct is clearly prohibited by the injunction. Nothing in the injunction clearly prohibited R.K. from modifying the pressure side of the valve spool. And SFAC was obviously aware of the conduct to which Whaley's language from the preliminary injunction referred.
SFAC's change of position at the contempt proceeding about the meaning of Whaley's language is precisely what a court may not permit. Even if SFAC's interpretation were plausible, the court was not free to consider its arguments in a vacuum. Unless a court construes an injunction's terms closely to its intended purpose, complainants could create endless arguments for a party's violation of an injunction. Contempt sanctions cannot be premised upon a moving target. We conclude that the district court erred in finding that SFAC had proved beyond a reasonable doubt that R.K.'s grinding on the pressure side of its hydraulic valve spools was prohibited by the injunction.

4. ATTORNEY FEES
In its cross-appeal, SFAC argues that the court erred in failing to award it the full amount of its requested attorney fees and expenses. Costs, including reasonable attorney fees, can be awarded in a contempt proceeding.[116] But an award of attorney fees requires a finding of contempt.[117] We have held that the court erred in finding R.K. willfully violated the injunction. It follows that its award of attorney fees and costs must be vacated.

*879 5. PROSPECTIVE STANDARD OF PROOF FOR SHOWING CIVIL CONTEMPT IS CLEAR AND CONVINCING EVIDENCE
Having overhauled our contempt jurisprudence, we believe that we should take a closer look at our present "beyond a reasonable doubt" standard of proof in civil contempt cases. This standard of proof dates back to our cases holding that all contempt proceedings are criminal in nature and governed by rules applicable to criminal prosecutions.[118] Unfortunately, some of these opinions ignored an earlier decision in which we had tried to reconcile the inconsistency in our case law and the case law of other states.
In Maryott v. State,[119] we stated that indirect contempts ÔÇö disobedience committed outside of the court's presence ÔÇö can be either criminal or civil. We recognized that contempt proceedings have both punitive and coercive aspects, but we stated: "Where a party to an action fails to obey an order of the court, made for the benefit of the opposing party, the rule is well recognized that such act is, ordinarily, a mere civil contempt, and the rules applicable to a criminal contempt are not applicable."[120] Accordingly, we rejected the contemnor's argument that the State must file an information to commence a contempt proceeding and held that the party injured by the contempt can commence a civil contempt proceeding by affidavit.
Later, we clarified that sanctions of fines or incarceration are criminal only if they (1) are intended to vindicate the court's authority and punish a contemnor for a completed act of disobedience and (2) cannot be mitigated by complying with the court's order.[121]
In 1975, following U.S. Supreme Court precedent, we held that a jury trial is not required before a court can commit a contemnor for civil contempt or punish petty criminal contempts summarily, when the punishment is not excessive.[122] The Nebraska Court of Appeals has explained that a jury trial with criminal protections is required only when a court commits a defendant for direct contempts if the cumulative incarceration period exceeds 6 months.[123] In 1980, we held that double jeopardy has no application to civil contempt proceedings to enforce child support obligations.[124] And in Grady v. Grady,[125] a 1981 case, we stated that "an action to enforce a court order is normally a mere civil contempt and requires the appropriate standard of proof applicable thereto instead of the stricter `proof beyond a reasonable doubt' standard applied to criminal contempts."
But we did not overrule cases applying the stricter standard of proof in Grady, and our rule requiring proof beyond a reasonable doubt in civil contempt proceedings persisted. In 1984, without discussing Grady, we again held in a civil contempt case that guilt must be established beyond a reasonable doubt.[126] In 1987, we cited California cases to support the "beyond a reasonable doubt" standard *880 of proof in civil contempt proceedings: "The requirement of proof beyond a reasonable doubt is justified in contempt cases because of the penalties that may be imposed."[127] And in 1994, also without discussing Grady, we reversed in part a Court of Appeals' opinion relying on Grady as authority for applying a preponderance standard of proof in civil contempt cases.[128]
Over the years, both this court and the Nebraska Court of Appeals have stated that "beyond a reasonable doubt" is the standard of proof in numerous civil contempt cases.[129] But our reinstatement of the stricter standard of proof has put this court in a small minority. Our research has uncovered only three state courts that require proof beyond a reasonable doubt in civil contempt cases: this court, California courts,[130] and Alabama courts.[131] As noted, the U.S. Supreme Court has held that civil contempt sanctions require neither a jury trial nor proof beyond a reasonable doubt.[132] Although the Supreme Court has not adopted a specific standard of proof for civil contempt proceedings, federal courts of appeals have unanimously required "clear and convincing" proof of civil contempt.[133] Many state courts also require clear and convincing proof of civil contempt.[134]
*881 We recognize that many state courts permit parties to prove civil contempt by a preponderance of the evidence.[135] And in some circumstances, Neb.Rev.Stat.  42-358(3) (Reissue 2008) permits a rebuttable presumption of contempt if a prima facie showing is made that an obligor is delinquent in his or her child or spousal support obligations.[136] But apart from a statutory mandate requiring a different standard, we do not believe presumptions or a preponderance standard is consistent with what we have stated about civil burdens of proof.
The standard of proof functions to instruct fact finders about the degree of confidence our society believes they should have in the correctness of their factual conclusions for a particular type of adjudication.[137] In a criminal case, due process requires the prosecution to prove, beyond a reasonable doubt, every factual element necessary to constitute the crime charged.[138] But in civil cases, when a party's interests are substantial and involve more than the mere loss of money, but obviously do not involve a criminal conviction, due process is satisfied by an intermediate "clear and convincing" standard of proof.[139]
Although a conditional commitment to jail is clearly not a criminal sanction, it involves more than the mere loss of money. Because a conditional commitment is a possible sanction in a civil contempt proceeding, we conclude that the "clear and convincing" standard of proof is the most appropriate standard. Proof beyond a reasonable doubt, however, is a criminal trial protection that does not apply to civil contempt proceedings.[140] Accordingly, we overrule all the cases listed in footnote 129 to the extent that these cases hold or imply that proof beyond a reasonable doubt is required for civil contempt proceedings. Outside of statutory procedures imposing a different standard, it is the complainant's burden to prove civil contempt by clear and convincing evidence.
A clear and convincing standard of proof would not have changed the outcome of this case, but applying the law retroactively could affect parties in pending cases who have justifiably relied upon our longstanding previous case law requiring proof "beyond a reasonable doubt" in civil contempt proceedings. Thus, "[f]airness and equity dictate that the above-announced rule of law be effective as of the date of this opinion."[141]

V. CONCLUSION
We conclude that a court has the inherent power to remedy a contemnor's willful *882 violation of its order or judgment by awarding compensatory relief to a party injured by the contempt. In a proper case, a court may award equitable relief to remedy the violation. We further conclude that a party may appeal from a final order of contempt, regardless whether the court's sanction is labeled civil or criminal. Because R.K. has appealed from a final order of contempt, we have jurisdiction.
We conclude that a court has inherent power to interpret its own injunctive decree if a party later seeks clarification or claims that a provision is unclear. Whether a party may appeal from such an order depends upon whether it affects a substantial right: it is not a final order if it does not change the parties' legal relationship by expanding or relaxing the decree's terms, dissolving the injunction, or granting additional injunctive relief. Because SFAC did not claim the court's order interpreting the injunction granted additional relief to it, we will not apply the law-of-the-case doctrine to hold that R.K. was bound by findings in the court's interpretative order because it did not appeal until the court entered its final order of contempt.
We conclude that the court erred in finding that SFAC had proved beyond a reasonable doubt that R.K. willfully violated the injunction by grinding on the pressure side of its hydraulic valve spools. We therefore reverse the district court's order finding R.K. in contempt. We remand the cause with directions that the court vacate its order finding R.K. in contempt and awarding SFAC attorney fees and costs.
Finally, we conclude that as of the date of this opinion, unless a statutory procedure imposes a different burden of proof, it will be the complainant's burden to prove civil contempt by clear and convincing evidence.
REVERSED AND REMANDED WITH DIRECTIONS.
NOTES
[1] Smeal Fire Apparatus Co. v. Kreikemeier, 271 Neb. 616, 715 N.W.2d 134 (2006).
[2] See Smeal Fire Apparatus Co. v. Kreikemeier, 13 Neb.App. 21, 690 N.W.2d 175 (2004), overruled in part, Smeal I, supra note 1.
[3] Smeal I, supra note 1.
[4] Id. at 621, 715 N.W.2d at 140, quoting Maddux v. Maddux, 239 Neb. 239, 475 N.W.2d 524 (1991).
[5] Connelly v. City of Omaha, 278 Neb. 311, 769 N.W.2d 394 (2009).
[6] Dunning v. Tallman, 244 Neb. 1, 504 N.W.2d 85 (1993).
[7] State ex rel. Kandt v. North Platte Baptist Church, 225 Neb. 657, 407 N.W.2d 747 (1987).
[8] In re Estate of Hedke, 278 Neb. 727, 775 N.W.2d 13 (2009).
[9] Kasparek v. May, 174 Neb. 732, 119 N.W.2d 512 (1963).
[10] Id. at 741, 119 N.W.2d at 519.
[11] Id.
[12] See Annot., 85 A.L.R.3d 895  5 (1978 & Supp.2009).
[13] See H.J. Heinz Co. v. Superior Court, 42 Cal.2d 164, 266 P.2d 5 (1954).
[14] See Dodson v. Dodson, 380 Md. 438, 845 A.2d 1194 (2004).
[15] See, Eliker v. Eliker, 206 Neb. 764, 770, 295 N.W.2d 268, 272 (1980) (emphasis supplied), quoting Maryott v. State, 124 Neb. 274, 246 N.W. 343 (1933); McFarland v. State, 165 Neb. 487, 86 N.W.2d 182 (1957); Leeman v. Vocelka, 149 Neb. 702, 32 N.W.2d 274 (1948).
[16] McFarland, supra note 15, quoting In re Nevitt, 117 F. 448 (8th Cir.1902). Accord Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911).
[17] McFarland, supra note 15, 165 Neb. at 492, 86 N.W.2d at 185, quoting Gompers, supra note 16.
[18] See, Trieweiler v. Sears, 268 Neb. 952, 689 N.W.2d 807 (2004); 1 Dan B. Dobbs, Dobbs Law of Remedies  4.1(1) (2d ed. 1993).
[19] See 1 Dobbs, supra note 18.
[20] In re Interest of Brandon M., 273 Neb. 47, 52, 727 N.W.2d 230, 235 (2007), quoting Black's Law Dictionary 1339 (8th ed. 2004).
[21] See State v. Moyer, 271 Neb. 776, 715 N.W.2d 565 (2006). Accord, Hicks v. Feiock, 485 U.S. 624, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988); Gompers, supra note 16.
[22] See, Holloway v. Water Co., 100 Kan. 414, 167 P. 265 (1917); Cincinnati v. Council, 35 Ohio St.2d 197, 299 N.E.2d 686 (1973); Malnar v. Whitfield, 774 P.2d 1075 (Okla.App. 1989). See, also, 66 Am.Jur.2d Restitution  1 (2001).
[23] See Webster's Encyclopedic Unabridged Dictionary of the English Language 1222 (1994) (defining restitution).
[24] See Mine Workers v. Bagwell, 512 U.S. 821, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994).
[25] See State ex rel. Cherry v. Burns, 258 Neb. 216, 602 N.W.2d 477 (1999). See, also, Eihusen v. Eihusen, 272 Neb. 462, 723 N.W.2d 60 (2006).
[26] See Holste v. Burlington Northern RR. Co., 256 Neb. 713, 592 N.W.2d 894 (1999). See, also, Hull v. Bahensky, 196 Neb. 648, 244 N.W.2d 293 (1976).
[27] See Koch v. Aupperle, 274 Neb. 52, 737 N.W.2d 869 (2007).
[28] See, Leman v. Krentler-Arnold Co., 284 U.S. 448, 52 S.Ct. 238, 76 L.Ed. 389 (1932); Gompers, supra note 16. Compare Lowe v. Prospect Hill Cemetery Ass'n, 75 Neb. 85, 106 N.W. 429 (1905).
[29] See 1 Dobbs, supra note 18 at 556.
[30] See Hornig v. Martel Lift Systems, 258 Neb. 764, 606 N.W.2d 764 (2000).
[31] State ex rel. Beck v. Frontier Airlines, Inc., 174 Neb. 172, 181, 116 N.W.2d 281, 286 (1962).
[32] See id.
[33] See Strunk v. Chromy-Strunk, 270 Neb. 917, 708 N.W.2d 821 (2006).
[34] See Laschanzky v. Laschanzky, 246 Neb. 705, 523 N.W.2d 29 (1994).
[35] See id.
[36] See Penn Cal, L.L.C. v. Penn Cal Dairy, 264 Neb. 122, 646 N.W.2d 601 (2002), quoting State v. Davidson, 260 Neb. 417, 618 N.W.2d 418 (2000).
[37] See, e.g., U.S. v. Alcoa, Inc., 533 F.3d 278 (5th Cir.2008); McGregor v. Chierico, 206 F.3d 1378 (11th Cir.2000); King v. Allied Vision, Ltd., 65 F.3d 1051 (2d Cir.1995); Kidder v. Kidder, 135 N.H. 609, 609 A.2d 1197 (1992); State v. Walton, 215 Or.App. 628, 170 P.3d 1122 (2007); Mulligan v. Piczon, 739 A.2d 605 (Pa.Commw.1999).
[38] McComb v. Jacksonville Paper Co., 336 U.S. 187, 193, 69 S.Ct. 497, 93 L.Ed. 599 (1949). See, also, Sheet Metal Workers v. EEOC, 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986).
[39] Kasparek, supra note 9.
[40] Dunning, supra note 6.
[41] Id. at 11, 504 N.W.2d at 93.
[42] Id.
[43] Id.
[44] Dunning, supra note 6.
[45] See Rauch v. Rauch, 256 Neb. 257, 590 N.W.2d 170 (1999).
[46] See Novak v. Novak, 245 Neb. 366, 513 N.W.2d 303 (1994). See, also, Grady v. Grady, 209 Neb. 311, 307 N.W.2d 780 (1981).
[47] Strunk, supra note 33.
[48] See Erickson v. Erickson, 998 So.2d 1182 (Fla.App.2008).
[49] See, Mays v. Mays, 229 Neb. 674, 428 N.W.2d 618 (1988); Neujahr v. Neujahr, 223 Neb. 722, 393 N.W.2d 47 (1986); Neujahr v. Neujahr, 218 Neb. 585, 357 N.W.2d 219 (1984).
[50] See, e.g., Baum v. Blue Moon Ventures, LLC, 513 F.3d 181 (5th Cir.2008); Arata v. Nu Skin Intern., Inc., 96 F.3d 1265 (9th Cir. 1996); U.S. v. Western Elec. Co., 894 F.2d 430 (D.C.Cir.1990).
[51] See, Dunning, supra note 6; State ex rel. Kandt, supra note 7.
[52] In re Contempt of Liles, 216 Neb. 531, 344 N.W.2d 626 (1984).
[53] See, Smeal I, supra note 1; Allen v. Sheriff of Lancaster Cty., 245 Neb. 149, 511 N.W.2d 125 (1994); Dunning, supra note 6; Maddux, supra note 4; State ex rel. Collins v. Beister, 227 Neb. 829, 420 N.W.2d 309 (1988); State ex rel. Kandt, supra note 7; State ex rel. Kandt v. North Platte Baptist Church, 219 Neb. 694, 365 N.W.2d 813 (1985); In re Contempt of Sileven, 219 Neb. 34, 361 N.W.2d 189 (1985); Sorensen v. Peterson, 218 Neb. 680, 358 N.W.2d 742 (1984); Rol v. Rol, 218 Neb. 305, 353 N.W.2d 19 (1984); Frandsen v. Frandsen, 216 Neb. 828, 346 N.W.2d 398 (1984); City of Beatrice v. Meints, 12 Neb.App. 276, 671 N.W.2d 243 (2003); Michael B. v. Donna M., 11 Neb.App. 346, 652 N.W.2d 618 (2002); In re Interest of Simon H., 8 Neb.App. 225, 590 N.W.2d 421 (1999); Jessen v. Jessen, 5 Neb. App. 914, 567 N.W.2d 612 (1997); Robbins v. Robbins, 3 Neb.App. 953, 536 N.W.2d 77 (1995); Hammond v. Hammond, 3 Neb.App. 536, 529 N.W.2d 542 (1995).
[54] See, Bagwell, supra note 24; McFarland, supra note 15, quoting Gompers, supra note 16.
[55] See, e.g., Smeal I, supra note 1, citing Liles, supra note 52; State ex rel. Kandt, supra note 7.
[56] See In re Contempt of Sileven, supra note 53, quoting Southern Railway Company v. Lanham, 403 F.2d 119 (5th Cir.1968).
[57] See, e.g., Dunning, supra note 6; State ex rel. Reitz v. Ringer, 244 Neb. 976, 510 N.W.2d 294 (1994), overruled on other grounds, Cross v. Perreten, 257 Neb. 776, 600 N.W.2d 780 (1999); Leeman, supra note 15.
[58] See Smeal I, supra note 1.
[59] See Doyle v. London Guarantee Co., 204 U.S. 599, 27 S.Ct. 313, 51 L.Ed. 641 (1907).
[60] See 15B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure  3917 at 387 (2d ed. 1992) (citing cases).
[61] See Fox v. Capital Co., 299 U.S. 105, 57 S.Ct. 57, 81 L.Ed. 67 (1936).
[62] See Doyle, supra note 59, citing Bessette v. W.B. Conkey Co., 194 U.S. 324, 24 S.Ct. 665, 48 L.Ed. 997 (1904).
[63] See, e.g., Berne Corp. v. Government of the Virgin Islands, 570 F.3d 130 (3d Cir.2009); Autotech Techs. v. Integral Research & Development, 499 F.3d 737 (7th Cir.2007); State of N.Y. v. Shore Realty Corp., 763 F.2d 49 (2d Cir.1985); Shuffler v. Heritage Bank, 720 F.2d 1141 (9th Cir.1983). See, also, 15B Wright et al., supra note 60,  3917.
[64] See, e.g., Consumers Gas & Oil v. Farmland Industries, Inc., 84 F.3d 367 (10th Cir. 1996).
[65] See, Shore Realty Corp., supra note 63; Shuffler, supra note 63.
[66] See State ex rel. Kandt, supra note 7, 225 Neb. at 660, 407 N.W.2d at 750.
[67] Liles, supra note 52, 216 Neb. at 534, 344 N.W.2d at 629.
[68] See, McFarland, supra note 15; In re Havelik, 45 Neb. 747, 64 N.W. 234 (1895).
[69] See, e.g., State ex rel. Reitz, supra note 57.
[70] See McFarland, supra note 15.
[71] Smeal I, supra note 1.
[72] See State ex rel. Collins, supra note 53.
[73] See Sileven v. Tesch, 212 Neb. 880, 326 N.W.2d 850 (1982).
[74] See State ex rel. Kandt, supra note 7.
[75] Compare Maddux, supra note 4, with Allen, supra note 53.
[76] See, Leman, supra note 28; Gompers, supra note 16.
[77] Heathman v. Kenney, 263 Neb. 966, 969, 644 N.W.2d 558, 561 (2002).
[78] See Hendrix v. Consolidated Van Lines, Inc., 176 Kan. 101, 269 P.2d 435 (1954).
[79] Liles, supra note 52.
[80] See Kasparek, supra note 9.
[81] See Sprunk v. Ditter, 209 Neb. 156, 306 N.W.2d 850 (1981).
[82] See id., quoting Kasparek, supra note 9.
[83] County of Sarpy v. City of Gretna, 276 Neb. 520, 755 N.W.2d 376 (2008).
[84] See Money v. Tyrrell Flowers, 275 Neb. 602, 748 N.W.2d 49 (2008).
[85] See United States v. U.S. Smelting Co., 339 U.S. 186, 70 S.Ct. 537, 94 L.Ed. 750 (1950).
[86] McComb, supra note 38, 336 U.S. at 192, 69 S.Ct. 497. See, also, Regal Knitwear Co. v. National Labor Relations Board, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661 (1945).
[87] See Travelers Indem. Co. v. Bailey, ___ U.S. ___, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009), citing Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934).
[88] Lowe, supra note 28.
[89] See id.
[90] See Neujahr, supra note 49, 223 Neb. 722, 393 N.W.2d 47 (1986).
[91] See id.
[92] See, McComb, supra note 38; Regal Knitwear Co., supra note 86.
[93] See 28 U.S.C.  1292(a)(1) (2006).
[94] See, e.g., Mikel v. Gourley, 951 F.2d 166 (8th Cir.1991); Motorola, Inc. v. Computer Displays Intern., 739 F.2d 1149 (7th Cir. 1984); 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure  3924.2 (2d ed. 1996 & Supp. 2009).
[95] See, e.g., Pimentel & Sons Guitar Makers, Inc. v. Pimentel, 477 F.3d 1151 (10th Cir. 2007); Cunningham v. David Special Commitment Center, 158 F.3d 1035 (9th Cir.1998); Mikel, supra note 94; Sierra Club v. Marsh, 907 F.2d 210 (1st Cir. 1990); Combs v. Ryan's Coal Co., Inc., 785 F.2d 970 (11th Cir.1986); Motorola, Inc., supra note 94.
[96] See Smeal I, supra note 1.
[97] See Smeal I, supra note 1.
[98] See, e.g., United States v. ITT Continental Baking Co., 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975); U.S. v. Saccoccia, 433 F.3d 19 (1st Cir.2005); U.S. v. Asarco Inc., 430 F.3d 972 (9th Cir.2005); McDowell v. Philadelphia Housing Authority (PHA), 423 F.3d 233 (3d Cir.2005).
[99] See Smeal Fire Apparatus Co. v. Kreikemeier, No. A-03-116, 2004 WL 2434884 (Neb. App. Nov.2, 2004) (not designated for permanent publication).
[100] Smeal I, supra note 1.
[101] See Smeal I, supra note 1.
[102] Smeal I, supra note 1, 271 Neb. at 627, 715 N.W.2d at 144.
[103] Schwartz v. Schwartz, 275 Neb. 492, 747 N.W.2d 400 (2008).
[104] Id.
[105] Douglas Cty. v. Kowal, 270 Neb. 982, 708 N.W.2d 668 (2006).
[106] Schwartz, supra note 103.
[107] Id.
[108] See id.
[109] Schmidt v. Lessard, 414 U.S. 473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974). Accord, Longshoremen v. Marine Trade Assn., 389 U.S. 64, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967); Project B.A.S.I.C. v. Kemp, 947 F.2d 11 (1st Cir. 1991). See, also, 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure  2955 (2d ed. 1995).
[110] Longshoremen, supra note 109, 389 U.S. at 76, 88 S.Ct. 201.
[111] Saccoccia, supra note 98, 433 F.3d at 28.
[112] Id. (citations omitted).
[113] See, e.g., Romero v. Drummond Co., Inc., 480 F.3d 1234 (11th Cir.2007); Perez v. Danbury Hosp., 347 F.3d 419 (2d Cir.2003); Gates v. Shinn, 98 F.3d 463 (9th Cir.1996); F.D.I.C. v. Conner, 20 F.3d 1376 (5th Cir.1994).
[114] See 3M v. Pribyl, 259 F.3d 587 (7th Cir. 2001).
[115] See, e.g., U.S. v. Conces, 507 F.3d 1028 (6th Cir.2007); Saccoccia, supra note 98; U.S. v. Voss, 82 F.3d 1521 (10th Cir.1996); In re Marcus, 138 Cal.App.4th 1009, 41 Cal. Rptr.3d 861 (2006); Chesapeake v. City of Baltimore, 89 Md.App. 54, 597 A.2d 503 (1991); Mtr Holtzman v. Beatty, 97 A.D.2d 79, 468 N.Y.S.2d 905 (1983); Marian Shop, Inc. v. Baird, 448 Pa.Super. 52, 670 A.2d 671 (1996).
[116] Smeal I, supra note 1.
[117] See Kasparek, supra note 9.
[118] See, e.g., Whipple v. Nelson, 138 Neb. 514, 293 N.W. 382 (1940).
[119] Maryott, supra note 15.
[120] Id. at 277, 246 N.W. at 344.
[121] See McFarland, supra note 15. Compare State ex rel. Collins, supra note 53.
[122] See Village of Springfield v. Hevelone, 195 Neb. 37, 236 N.W.2d 811 (1975), citing Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968).
[123] See State v. Harker, 8 Neb.App. 663, 600 N.W.2d 488 (1999).
[124] See Eliker, supra note 15.
[125] See Grady, supra note 46, 209 Neb. at 316, 307 N.W.2d at 782.
[126] In re Contempt of Liles, 217 Neb. 414, 349 N.W.2d 377 (1984).
[127] State ex rel. Kandt, supra note 7, 225 Neb. at 661, 407 N.W.2d at 750-51, citing Ross v. Superior Court, 19 Cal.3d 899, 569 P.2d 727, 141 Cal.Rptr. 133 (1977), and Farace v. Superior Court for County of Orange, 148 Cal. App.3d 915, 196 Cal.Rptr. 297 (1983).
[128] See Novak, supra note 46 (overruling Novak v. Novak, 2 Neb.App. 21, 508 N.W.2d 283 (1993)).
[129] See, Schwartz, supra note 103; Kowal, supra note 105; Klinginsmith v. Wichmann, 252 Neb. 889, 567 N.W.2d 172 (1997); Novak, supra note 46; Dunning, supra note 6; State ex rel. Kandt, supra note 7; Liles, supra note 126; Bahm v. Raikes, 200 Neb. 195, 263 N.W.2d 437 (1978); Paasch v. Brown, 199 Neb. 683, 260 N.W.2d 612 (1977); Kasparek, supra note 9; Frye v. Frye, 158 Neb. 694, 64 N.W.2d 468 (1954); Whipple, supra note 118; Lawson v. Lawson, 16 Neb.App. 854, 753 N.W.2d 863 (2008); Locke v. Volkmer, 8 Neb. App. 797, 601 N.W.2d 807 (1999).
[130] See, Ross, supra note 127; McCann v. Municipal Court, 221 Cal.App.3d 527, 270 Cal.Rptr. 640 (1990).
[131] See Savage v. Ingram, 675 So.2d 892 (Ala. Civ.App.1996).
[132] See Bagwell, supra note 24. See, also, Hicks, supra note 21; U.S. v. Harris, 582 F.3d 512 (3d Cir.2009); Lasar v. Ford Motor Co., 399 F.3d 1101 (9th Cir.2005); F.T.C. v. Kuykendall, 371 F.3d 745 (10th Cir.2004).
[133] See, In re Grand Jury Subpoena (T-112), 597 F.3d 189 (4th Cir.2010); Marshak v. Treadwell, 595 F.3d 478 (3d Cir.2009); F.T.C. v. Trudeau, 579 F.3d 754 (7th Cir.2009); Whitcraft v. Brown, 570 F.3d 268 (5th Cir. 2009); Labor/Community Strategy Ctr. v. Los Angeles County, 564 F.3d 1115 (9th Cir.2009); In re Grand Jury Investigation, 545 F.3d 21 (1st Cir.2008); U.S. v. Ford, 514 F.3d 1047 (10th Cir.2008); Conces, supra note 115; Georgia Power Co. v. N.L.R.B., 484 F.3d 1288 (11th Cir.2007); Paramedics Electro. v. GE Medical Systems, 369 F.3d 645 (2d Cir.2004); Jake's, Ltd., Inc. v. City of Coates, 356 F.3d 896 (8th Cir.2004); Food Lion v. United Food & Commercial Workers Union, 103 F.3d 1007 (D.C.Cir.1997).
[134] See, Loewinger v. Stokes, 977 A.2d 901 (D.C.2009); Matsuura v. E.I. du Pont de Nemours and Co., 102 Hawai'i 149, 73 P.3d 687 (2003); Efstathiou v. Efstathiou, 982 A.2d 339 (Me.2009); In re Birchall, 454 Mass. 837, 913 N.E.2d 799 (2009); Town of Riverhead v. T.S. Haulers, Inc., 68 A.D.3d 1103, 890 N.Y.S.2d 332 (2009); Martin v. Martin, 179 Ohio App.3d 805, 903 N.E.2d 1243 (2008); Henry v. Schmidt, 91 P.3d 651 (Okla.2004); Now Courier v. Better Carrier Corp., 965 A.2d 429 (R.I.2009); Durlach v. Durlach, 359 S.C. 64, 596 S.E.2d 908 (2004); Barton v. Barton, 29 P.3d 13 (Utah App.2001); Vt. Women's Health Ctr. v. Operation Rescue, 159 Vt. 141, 617 A.2d 411 (1992).
[135] See, e.g., West v. Municipality of Anchorage, 174 P.3d 224 (Alaska 2007); Braisted v. State, 614 So.2d 639 (Fla.App. 1993); Talton v. USAA Cas. Ins. Co., 981 So.2d 696 (La.App. 2008); Fisher v. McCrary, 186 Md.App. 86, 972 A.2d 954 (2009); Bounds v. Bounds, 935 So.2d 407 (Miss.App.2006); State ex rel. Udall v. Wimberly, 118 N.M. 627, 884 P.2d 518 (N.M.App.1994); Harcar v. Harcar, 982 A.2d 1230 (Pa.Super.2009); Moody v. Hutchison, 159 S.W.3d 15 (Tenn.App.2004).
[136] See Hicks, supra note 21.
[137] See Nebraska Legislature on behalf of State v. Hergert, 271 Neb. 976, 720 N.W.2d 372 (2006), quoting Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).
[138] Id.
[139] See id., citing Addington, supra note 137.
[140] See, Bagwell, supra note 24; Grady, supra note 46.
[141] See Commercial Fed. Sav. & Loan v. ABA Corp., 230 Neb. 317, 322, 431 N.W.2d 613, 617 (1988). See, also, Gt. Northern Ry. v. Sunburst Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932).