IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

ARAUJO V. ARAUJO

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DENA M. ARAUJO, APPELLANT,

V.

DAVID R. ARAUJO, APPELLEE.

Filed July 18, 2017.    No. A-16-453.

Appeal from the District Court for Sarpy County: WILLIAM B. ZASTERA, Judge. Affirmed as modified.

Christopher Perrone, of Perrone Law, for appellant.

Edith T. Peebles and Tosha Rae D. Heavican, of Brodkey, Peebles, Belmont & Line, L.L.P., for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

The Sarpy County District Court dissolved the marriage between Dena M. Araujo and David R. Araujo. A decree was entered from which Dena has appealed and assigned numerous errors related to parenting time and other contact with the children, child support, property, debts, contempt, military retirement pay, alimony, and guardian ad litem (GAL) and attorney fees. We affirm the decree as modified herein.

## II. BACKGROUND

Dena and David were married in June 1997; both were 32 years of age at that time. They had four children, namely: Tyler (born 1997), Zachary (born 1999), Dylan (born 2001), and Natalie (born 2004). David had been in the Marine Corps as a computer programmer for four years, and

- 1 -

then joined the Air Force as an accountant. He then transferred and worked in space administration and operations until his retirement in 2006. After that, he worked with a company called SAIC at Strategic Command headquarters doing planning and operations. Dena attended 3½ years of college, but did not obtain a degree. She speaks English and Swedish, and has worked as a chiropractic assistant, worked in a department store at a cosmetics counter, and worked for a company organizing events in different places. At the time of trial, she was working as a "para" for special education students earning $11.27 per hour.

In 2006, David was diagnosed with a sphincter of oddi dysfunction. According to David, this was "an unfortunate side effect" of having his gallbladder removed in 2005. At the time of his gallbladder surgery, he was diagnosed with pancreatitis. In 2009, David had a pancreatic attack that put him in the hospital for a month; he lost significant weight and was unable to work for a couple of months. David's pancreatitis kept getting worse; there were times he could do things and times he could not.

In May 2013, Dena filed a complaint for legal separation. The following month, David filed an answer and "counter-complaint" for dissolution of the marriage. Dena asked for sole legal and physical custody of the children, and while David pled he was the fit and proper person to have legal and physical custody of the children, his prayer asked that he and Dena be granted legal and physical custody. Each asked for child support and an equitable division of their assets and debts. Dena also asked for the parties to share medical and childcare expenses. Dena requested that David's parenting time be supervised, that a GAL be appointed for the children, and that David be ordered to undergo a psychological evaluation. Dena also asked for spousal support. David requested a non-hypothecation order restraining both parties from certain actions related to their real and personal property, except in the usual course of business or for the necessities of life.

In June 2013, David went to visit his brother in Utah and reconnected with a past friend, Kimberli Doxey. By July, David and Kimberli had discussed Kimberli moving to Nebraska to help David after a surgery he had planned in December. By the end of 2013, David rented a home for Kimberli and two of her children, Andrew Doxey (age 25) and Bridger Doxey (age 15). According to Kimberli, Andrew quit his job in Utah to help her provide 24-hour care for David.

In December 2013, David had surgery to remove his pancreas, spleen, and part of his stomach. Complications from surgery caused stomach fluid to leak into his abdominal cavity and it caused him to have a seizure and go into a coma. He was in a coma for about two weeks; he was hospitalized from December 2013 until February 2014. From February to July 2014, David tried to work about 14 hours per week, but the pain in his abdomen was excruciating. Eating caused the most pain. David has a feeding tube 24 hours a day, and as a result of losing his pancreas, he is diabetic and on insulin. It is difficult for him to stand more than 10 minutes; he cannot stand without a cane as he "just get[s] too shaky. [His] muscles just won't let [him]." David's last day of work was July 31, 2014; he cannot work due to his physical limitations.

Trial was held on August 18 and 19, and October 1 and 2, 2015. David and four other witnesses testified on his behalf. Dena and one other witness testified on her behalf. The district court issued findings dated November 19, 2015, and entered a decree of dissolution on February 4, 2016, with the court's findings attached and incorporated into the decree. Dena was awarded custody of the children subject to David's graduated and "therapeutic" parenting schedule. The schedule begins with bi-monthly therapeutic parenting time for five months and increases

thereafter until after 11 months when David would have parenting time every other weekend from 8 a.m. on Saturday until 5 p.m. on Sunday. Holiday parenting time was also scheduled. David was ordered to pay $1,535 per month in child support, maintain the children on his Tri-Care health insurance plan, and pay 60-percent of nonreimbursed healthcare expenses incurred by the children after the first $480 per child has been paid by Dena. Dena was awarded the marital residence and "$270.00 of [David's] net disposable military pension." Property and debts were divided, the right to claim the children for tax purposes was equally divided between the parties, neither party was awarded alimony, and each party was ordered to pay their own attorney fees and costs. The parties were ordered to pay the GAL fee of $1,726.73, with each to pay 50-percent of that fee. Dena was ordered to pay a property equalization amount of $9,528.77 within 180 days of entry of the decree.

Dena timely appealed.

## III. ASSIGNMENTS OF ERROR

Dena assigns, reordered, that the district court erred: (1) by awarding David parenting time that was not in the best interests of the children; (2) by failing to prohibit the Doxey family from having contact with the children; (3) by calculating the child support incorrectly; (4) by not awarding Dena all four tax exemptions for 2015; (5) by failing to find David in contempt or otherwise ruling on pending contempt actions filed by Dena; (6) by failing to give Dena full credit for temporary order arrears; (7) in its division of the marital estate by (a) miscalculating the equity in the marital residence, (b) miscalculating the division of household goods and gifts, (c) including a $4,500 loan as a marital debt, and (d) determining the 2012 tax debt was a marital debt; (8) by failing to include standard provisions in the decree to protect Dena's interests in David's military retirement pay; (9) by failing to award alimony to Dena; and (10) by failing to equitably divide the GAL fees and failing to order David to pay any of Dena's attorney fees.

## IV. STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015). This standard of review applies to the trial court's determinations regarding custody, child support, the division of property, alimony, and attorney fees. *Id*.

Child custody and parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. See *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*. A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id*.

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## V. ANALYSIS

### 1. PARENTING TIME AWARDED TO DAVID

The district court found that both Dena and David were fit and proper persons to have the care, custody, and control of their minor children, but that it was in the best interests of the minor children that custody be awarded to Dena, subject to David's graduated and "therapeutic" parenting schedule. The schedule begins with bi-monthly therapeutic parenting time for five months and increases thereafter until after 11 months when David would have parenting time every other weekend from 8 a.m. on Saturday until 5 p.m. on Sunday. Holiday parenting time was also scheduled.

Dena argues that the amount of parenting time awarded to David "is far in excess of that which he is physically capable of exercising at this time, not in line with the recommendation of the expert witness, and not in the best interests of the minor children." Brief for appellant at 16. Dena claims that David's "physical health is a real problem," and the family's therapist, Traci Penrod-McCormick, "clearly indicated that it would not be in the best interests of the children to extend visitation longer than 3-4 hours at a time." Brief for appellant at 16.

Penrod-McCormick has been the family's therapist since July 2013; she was agreed upon by the parties and the GAL. She received a master's degree in social work in 2004, and is a licensed clinical social worker and a licensed independent mental health practitioner in Nebraska. Children and families have been the focus of Penrod-McCormick's professional and clinical experience. She saw just the children "maybe one or two times a month." In September or October 2013, she started sessions with the children and David, and according to Penrod-McCormick, David had "about twelve" therapeutic visits with the children since that time until mid-August 2015.

Penrod-McCormick said the children "function fine in their daily lives and at school." She has discussed "having visitation with their father," and in the beginning "it became pretty volatile, lots of anger came out, and [she] didn't think [they] were making a lot of progress at that point." The children were frustrated, "feeling as though their father wasn't understanding where they were coming from emotionally, and then his response to that, they became upset." According to Penrod-McCormick, David would "say he was sorry and he loved them. And then he would say, but you have to think about how I feel. You have to think about [sic] from my perspective." Penrod-McCormick thought this made it difficult for the children "to feel like [David] was hearing them." She did not believe there had been any progress made in the relationship between David and the children since they started therapy two years prior. She described their relationship as "[s]uperficial." She explained:

> Dad is always very open about how he loves them and wants to see them. He's very open, but it doesn't go any further than that. The kids will talk about what's going on at school. They'll talk about their sporting events. But it doesn't go any further than that.
>
> . . . .
>
> [David] attends, he asks questions, he asks how they are, asks how they're doing, but it's never - you know, there have been times where, like the kids have said, you say you're going to come but you don't come. But then that turns into, but I'm sick and you have to realize that I'm sick, and I can't do this because I'm sick, but - and it just becomes a circle of - and kind of a rabbit hole of everybody going all these different ways and there's

no resolution, so - but, for the most part, it's just, how are things, how is it going, this is how I'm doing in this, this is how soccer is going, and that's it.

Going forward, she suggested continued therapy with David and her, "[a]nd then . . . moving into some visitation I think is fine." However, Penrod-McCormick was concerned about long periods of parenting time, such as 6 to 8 hours of extended time or overnights, stating:

> I've heard over and over from everybody how sick [David] is, and at this point I am not in a place where I believe that he can emotionally and physically support these children outside of - in these long times, these long periods of time. There's four active children that not only are busy but are active and intellectual.

Penrod-McCormick said she was fine with 3 to 4 hours on a Saturday and Sunday, "[b]ut outside of that, I think it's too much." She also said David

> needs to be able to put his adult feelings aside and focus on the needs of - emotional needs of his children and attend to those, work through his adult stuff on his own, but his primary focus needs to be on his kids' emotional needs in relation to getting them together. So accept that they're angry, and instead of trying to constantly say, yeah, but, and make excuses for it, accept that they're angry. Honor that anger and say, how can we move forward.

Penrod-McCormick said she talked to David about this, "maybe even a year ago," but there had been no progress on this.

David argues that while he "has limitations that may not be experienced by other parents, they do not prevent him from acting as a father." Brief for appellee at 13-14. David testified that during his parenting time with the children in 2013 (prior to the mandated therapeutic visitation), he took the children for ice cream and fries, they went on walks, went fishing, played games on the Wii, and watched movies. "The parties' children are ages 11-18 (at the time of trial), and are old enough to assist in the procurement of their needs." Brief for appellee at 14. David testified that "[i]f there was no court involved, it is my opinion that [Dena] would take the children and make sure they never saw me again."

Keeping the evidence and the court's findings in mind, we now consider the legal principles governing parenting time matters. The trial court has discretion to set a reasonable parenting time schedule. *Thompson v. Thompson*, 24 Neb. App. 349, 887 N.W.2d 52 (2016). The determination of reasonableness is to be made on a case-by-case basis. *Id*. Parenting time relates to continuing and fostering the normal parental relationship of the noncustodial parent. *Id*. See, also, *Fine v. Fine*, 261 Neb. 836, 626 N.W.2d 526 (2001); *Walters v. Walters*, 12 Neb. App. 340, 673 N.W.2d 585 (2004). The best interests of the children are the primary and paramount considerations in determining and modifying visitation rights. *Thompson, supra*. The best interests inquiry has its foundation in both statutory and case law.

Neb. Rev. Stat. 43-2923(6) (Reissue 2016) provides that in determining custody and parenting arrangements:

> [T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

- 5 -

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. . . .

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

Based on the evidence, the court's findings, and the foregoing legal principles, we cannot say that the district court abused its discretion in the parenting time awarded to David.

### 2. DOXEY FAMILY

Clearly, Dena does not think much of David's girlfriend, Kimberli. Kimberli had filed a protection order against Dena for stalking Kimberli's children, and Dena says "the allegations were so unfounded that the case was dismissed after [Kimberli's] testimony and without [Dena] having to even put forth a defense." Brief for appellant at 20. Dena also expressed concern about Kimberli's adult son, Andrew, who Dena believed, but was unable to prove, was involved in a juvenile case of a sexual nature. Based upon alleged inconsistent statements from David and Kimberli's testimony on this issue, Dena claims, "It is obvious [Kimberli] did not tell the truth and that makes her even more dangerous to the Araujo children. She is someone willing to defy court orders[,] . . . file protection orders without any legal or factual basis, and lie under oath in court." Brief for appellant at 21.

David argues that "Dena has provided no concrete, direct evidence as to the supposed allegations against Andrew," and that she "continues to assert allegations of a sexual nature, but failed to bring forth any evidence that such an event occurred." Brief for appellee at 17. "Dena's opposing testimony and belief that Kimberli lied regarding the supposed allegations against Andrew, does not automatically make the allegations true." *Id*. Furthermore, "[i]t is evident from Dena's testimony that she does nothing to help foster a relationship between her children and their father or Kimberli." *Id*. at 18. When asked if she told the children that David's live-in girlfriend is someone with whom they should not have a relationship, Dena responded:

The kids hate Kim. They despise her. . . . You know, they're very bright kids, and they've been fortunate enough to grow up around families where the children live with both of their parents and they know this is wrong. I don't need to spell it out for them. It's wrong. They're Christians. They know right from wrong.

Penrod-McCormick testified that the children are angry with Kimberli's "presence," and there have been interactions between her and the children "that have upset the children, and at this point they stated they are not comfortable being around her nor do they want to have contact with her." The children "do not want to be in the presence of the Doxey family at all." On cross-examination, Penrod-McCormick was asked how many times the children had been around Kimberli. Penrod-McCormick said "I know for sure the two younger kids during one visitation."

David argues that the trial court weighed the evidence and testimony presented and determined that no limitation on visitation was necessary and, therefore, did not provide one. We agree with David's summation. Based on the evidence presented, the district court's failure to prohibit the Doxey family from having contact with the parties' children was not an abuse of discretion.

### 3. CHILD SUPPORT

Commencing December 1, 2015, David was ordered to pay $1,535 per month in child support for four children, which reduced to $1,309 per month when only three children remained as minors, $1,137 per month for two children, and $781 per month when only one child remained a minor. Dena contends the district court adopted a child support calculation which did not comport to the evidence presented at trial, wrongly assigned incomes to each party, and wrongly credited David for monthly health care premiums related to the children.

### (a) David's Income

Regarding income, Dena claims that exhibit 7 (offered by David) shows two primary sources of income received each month: Veterans Affairs (VA) disability of $3,776 per month (not taxed) and military retirement pay of $1,676 per month (taxed). The child support worksheet incorporated into the decree shows $3,700 in non-taxable income and $985.33 in taxable monthly income. Dena argues that the non-taxable VA disability should reflect the full $3,776 per month, and with regard to the military retirement pay, that amount should have been $1,406 (this accounts for the $270 per month awarded to Dena from David's military retirement pay). Dena believes the district court relied upon exhibit 22, which she claims contains incorrect information.

Exhibit 7 actually shows that David's gross military retirement pay is $2,053 per month, and after "SBP Costs" and federal and state income tax deductions, his net pay is $1,676.82. In his brief, David acknowledges the court's error, and agrees that his net retirement pay amount (after accounting for the $270 in military retirement pay awarded to Dena) should have been $1,406 ($1,676 minus $270).

As for David's non-taxable disability pay, Exhibit 7 contains a letter from the VA, showing that David was entitled to a monthly payment of $3,712.87 because he was a Veteran with five dependents. Dena's assertion that David's VA disability is $3,776 per month comes from a bank statement in exhibit 7 showing a deposit of $3,776 into David's bank account in May 2015. According to David's testimony, the extra amount of the deposit above the $3,712.87 can be attributed to money he received from donated leave; he testified that at the time of trial that money from donated leave is no longer available to him. We cannot say that the court's use of $3,700 for David's VA disability was an abuse of discretion (especially since, as noted below, the district court also attributed a lower hourly wage to Dena's employment).

Having reviewed the record, we find that David's total monthly income includes $3,700 from non-taxable disability, and $2,053 in gross military retirement pay. From his gross military retirement pay, federal and state income taxes will be deducted, as will the "SBP Costs" which were not challenged by Dena. As will be discussed later in this opinion, the district court incorrectly calculated the military retirement pay awarded to Dena; under our later modification, Dena is awarded $363 per month from David's military retirement pay. Accordingly, in our child support calculation, David will also receive a credit for the $363 in military retirement pay awarded to Dena. We will modify the child support worksheet accordingly, as discussed in more detail later.

(b) Dena's Income

The district court attributed a total monthly income of $3,705 to Dena. The court used "a 3-year average for trust distribution, and a percentage split of [David's] military pension of $270.00 owed to [Dena] in determining gross income." As will be discussed later, the 3-year average for the trust distribution from 2013 to 2015 was $18,000 ($1,500 per month). Using the numbers above, the district court necessarily attributed $1,935 per month to Dena's income from employment; this is the same amount David attributed to Dena's employment income in his proposed child support calculation (exhibit 22). Although David said the $1,935 per month income was calculated using $11.25 per hour for a 40-hour workweek, by our calculation $1,935 per month equates to $11.16 per hour, 40 hours per week, 52 weeks per year.

With regard to Dena's income, she claims the $44,460 per year ($3,705 per month) in income that the district court attributed to her was "well above what the evidence suggests." Brief for appellant at 24. She earns $11 per hour and works "about 30 hours per week, 42 weeks out of the year." *Id*. According to her testimony, at the time of trial, she was working as a "para" for special education students earning $11.27 per hour. Dena testified that in Spring 2014, she was working 32.5 hours per week. There was no other testimony regarding the number of hours per week she worked, nor the number of weeks per year. However, she did testify that she is able to drop her daughter off at school and pick her up at the end of the day, and if the children have a day off, so does Dena; this suggests a school day schedule. When asked if she had applications out for other employment, Dena said, "No. This . . . is the perfect job," because it allowed her to have the same schedule as her children.

David argues that Dena has the ability to work year-round, but has voluntarily opted out. Dena testified that she can "work summer school" but did not do so in either 2014 or 2015. In 2014, she was preparing for trial, which "was supposed to be the court date at that point." And, "I needed to prepare myself for this. There have been a lot of lies told, and I needed to have a set-up to -- to demonstrate the truth." David argues that "[u]nder the Child Support Guidelines, it is completely within the discretion of the trial court to impute a wage to Dena that comports with her capacity to earn," and he should not be penalized for her choice to remain at home. Brief for appellee at 20.

In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013). The guidelines provide that "[i]f applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all

sources." *Freeman*, 286 Neb. at 721, 838 N.W.2d at 307. See, also, Neb. Ct. R. § 4-204 (rev. 2016). Use of earning capacity to calculate child support is useful "when it appears that the parent is capable of earning more income than is presently being earned." *Freeman*, 286 Neb. at 721, 838 N.W.2d at 307.

Dena testified that she earns $11.27 per hour, and by choice does not work full-time. In addition, she was not looking for different employment because she liked having the same schedule as her children. As stated previously, it appears that the district court attributed $1,935 per month to Dena's income from employment; the same amount David attributed to Dena's employment income in his proposed child support calculation (exhibit 22). This monthly amount equates to $11.16 per hour, 40 hours per work, 52 weeks per year. Based on our review of the record, we cannot say that the district court abused its discretion in attributing such earning capacity to Dena.

Dena also acknowledges attribution of $270 (now modified to $363) in income per month as a result of the award from David's military retirement, but challenges the court's use of a 3-year average for her trust distribution. Dena testified that she receives an annual payout from her father's estate. She claims the only evidence of her inheritance distributions is found in exhibit 24, which shows a 3-year average for 2013-2015 of $18,000 per year ($1,500 per month), and "there is no evidence to the contrary." Brief for appellant at 24. See, also, Nebraska Child Support Guidelines, worksheet 1 (fifth footnote) (income may be averaged in the event of substantial fluctuations of annual earnings); *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007) (3-year average to be used when averaging income). Dena also argues that the inheritance should not be attributed as income for child support purposes, and "leave[s] this for this Court to decide." *Id*. With regard to Dena's inheritance, David argues that it was properly considered by the court as a source of funds for purposes of child support because the court must consider income derived from all sources.

For purposes of calculating child support, the court must consider the total monthly income, which is "income of both parties *derived from all sources*, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages." § 4-204 (emphasis supplied). This includes trust distributions. See *Hughes v. Hughes*, 14 Neb. App. 229, 706 N.W.2d 569 (2005) (for purposes of child support, husband's income included income generated from his mother's trust). See, also, *Marcovitz v. Rogers*, 267 Neb. 456, 675 N.W.2d 132 (2004) (profits generated from real estate development entities, in which ex-wife had inherited ownership interest, constituted "income" for purposes of calculating child support). Accordingly, the district court properly included Dena's trust distributions when determining her income; as she noted, the 3-year average for 2013 to 2015 was $18,000 ($1,500 per month), which appears to be the amount used by the district court.

Having reviewed the record, we find that Dena's total monthly income includes $1,935 from employment, $363 from David's military retirement pay, and $1,500 from trust distributions; a total of $3,798. We will modify the child support worksheet accordingly, as discussed in more detail later.

(c) Health Insurance Credit

As to the $93 per month health insurance premium credit given to David, Dena argues that David testified at previous hearings that his monthly cost for himself and the children was $45.

Dena says the only exhibit offered to show health premium costs was exhibit 23, and it reflects a past due amount of $46.32. She also says "[i]t is unknown as to why Exhibit 23 shows the current amount due of $92.64, but it is exactly 2x the amount past due which cannot be an accident." Brief for appellant at 26. At trial, David testified that his health insurance premium cost was $138 per month. But in his brief he argues that the court can easily surmise from exhibit 23 that the monthly cost for the health insurance premium is $93. We have reviewed exhibit 23, a UnitedHealthcare Statement dated January 12, 2015, and it shows the total amount due as $138.96; this included $46.32 (past due) plus $92.64 (current due). Exhibit 23 was the only documentary evidence of the health insurance premium presented to the district court, and it was the district court's decision to attribute $93 per month to the health insurance premium; this was not an abuse of discretion. Furthermore, because this is the only documentary evidence in the record regarding the premium, we cannot say that the district court abused its discretion in awarding the entire amount as a credit in the child support worksheet.

### (d) New Child Support Calculation

Based on the foregoing, we have modified the child support calculation and attached the worksheet to this opinion as appendix A. In our calculation, Dena was attributed a total monthly income of $3,798. David was attributed a total monthly income of $2,053 from his military retirement pay, and tax-exempt income of $3,700 from his VA disability. David was also given "Other Deductions" totaling $497.62 ($363 for military retirement pay awarded to Dena and $134.62 for "SBP Costs" which were not challenged by Dena), and a health insurance premium credit of $93. Finally, because the district court ordered that each party was entitled to claim two minor children for dependency and exemption benefits, our calculation includes three exemptions for each party (the party, plus two children).

Pursuant to the new calculation, David's child support obligation is $1,642 per month for four children; $1,400 per month for three children; $1,219 per month for two children; and when only one child remains a minor, David shall pay $844 per month. We modify the decree accordingly.

### (e) Order for Direct Payment

Dena also contends that the court should have ordered that child support payments be directly paid from David's VA disability, if such a direct payment is allowed. David contends that Dena never presented this issue to the trial court and that "'an issue not properly presented to and passed upon by the trial court may not be raised on appeal.'" Brief for appellee at 22 (quoting *Gebhardt v. Gebhardt*, 16 Neb. App. 565, 575, 746 N.W.2d 707, 715 (2008)). We agree with David that Dena has not preserved the issue for appeal.

### (f) Plain Error

Although not assigned or argued by the parties, we note an issue of plain error. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Sickler v. Sickler*, 293 Neb. 521, 878 N.W.2d 549 (2016).

In the decree, the district court ordered that the uninsured/nonreimbursed healthcare expenses incurred on behalf of the minor children were to be allocated as follows: "thirty percent (30%) to be paid by [Dena] and sixty percent (60%) to be paid by [David]." However, the district court's allocation of expenses does not equal 100-percent. The discrepancy was raised at the motion for new trial, but not raised in the briefs on appeal. Accordingly, finding plain error, we modify the decree so that the uninsured/nonreimbursed healthcare expenses incurred on behalf of the minor children are allocated 40-percent to Dena and 60-percent to David. This is in line with each parent's respective percent share of the child support obligation. See Neb. Ct. R. § 4-215 (rev. 2011).

### 4. TAX EXEMPTIONS

Dena argues that the trial court erred by not awarding her all four exemptions for 2015, because David claimed all four children in 2013 and two children in 2014 (despite the court awarding all four exemptions to Dena for 2014). David argues that the tax exemption issue was clearly within the purview of the trial court to determine. Upon our de novo review, we cannot say that the district court abused its discretion in awarding Dena only two, rather than all four, dependency exemptions for 2015.

### 5. CONTEMPT ACTIONS FILED BY DENA

Dena argues, "The Court erred by not finding [David] in contempt for failure to pay child support as alleged and as supported by the evidence adduced at trial. Actually, the Court made no actual finding as to the show cause issues, but such are deemed to have been denied absent a ruling to the contrary." Brief for appellant at 36. According to Dena, two contempt actions were filed in this case: the first contempt action was filed on September 9, 2014, for failure to pay child support, and it was "basically merged with the second contempt action" filed on July 20, 2015, based upon a continued failure to pay child support. Brief for appellant at 37. She contends that the district court only needed to rule on the second action. (Neither the September 2014 nor the July 2015 pleadings appear in our record.) Dena claims that over a 24-month period from July 2013 through June 2015, David paid only $36,800 of the $52,000 owed in child support. She acknowledges that David paid an additional $3,300 just before trial, but even so, he still "underpaid $13,000 in child support during the period of time related to either or both of the show cause actions." Brief for appellant at 37. Dena states that David had the income, but he chose not to pay the child support owed.

Dena contends that the contempt filings also raised David's failure to make house payments as ordered. According to Dena, "David chose to pay his new debts related to the Doxey family, his new life, and the debts related to his new house, instead of paying the Court ordered debts for the Araujo family." Brief for appellant at 38.

David argues that "[t]here is nothing in the record to indicate that Dena preserved her argument for appeal regarding any alleged contempt of David. Additionally, there is nothing in the record before this court which would contemplate grounds for appeal, regarding contempt[.]" Brief for appellee at 28.

As stated previously, our record does not contain any pleadings regarding an application(s) for contempt. However, the contempt action(s) were mentioned at various hearings in September

- 11 -

and November 2014 and in May 2015. It appears that the contempt action(s) were continued to the date of trial. And the record from the trial reflects that the contempt action(s) were to be heard at the same time as trial. The February 2016 divorce decree does not address the contempt action(s), and no other order disposing of the contempt action(s) appears in our record. Accordingly, while the decree itself was a final appealable order, we do not have jurisdiction over the contempt actions(s) because we lack a final appealable order of such action(s). See *Belitz v. Belitz*, 21 Neb. App. 716, 842 N.W.2d 613 (2014) (application to modify custody and application for an order to show cause regarding contempt were two separate pleadings and presented separate issues even though heard at same time; one sought new relief, the other sought to enforce relief previously granted; each needed to be timely appealed). See, also, *Michael B. v. Donna M.*, 11 Neb. App. 346, 652 N.W.2d 618 (2002), *overruled on other grounds, Smeal Fire Apparatus Co. v. Kreikemeier,* 279 Neb. 661, 782 N.W.2d 848 (2010).

### 6. Credit for Temporary Order Arrears

Dena says that while the district court did include child support arrearages of $9,132 "in the balance sheet," it failed to factor in "the arrears for missed house payments (ordered in lieu of alimony) into the balance sheet." Brief for appellant at 28. We note that the "balance sheet" does not specifically state that the arrears included were for child support.

Dena claims David made no house payments from December 2014 through November 2015 when the court entered "its tentative findings in the case (11 months) or for the 14 months between the times the payments were reinstated and the Decree was entered by the Court thereby terminating the provisions of the temporary order." *Id.* Based on monthly house payments of $1,418 (exhibit 16), Dena claims the court failed to preserve the $15,598 (11 months) or the $19,852 (14 months) David was previously ordered to pay her under the temporary order. Dena contends the court should have done one of two things: (1) included the house payment arrears in the balance sheet for the marital estate, or (2) preserved such arrearage from the temporary order so that Dena could bring the issue in the form of a show cause action against David in the future.

As stated previously, David's failure to make mortgage payments was the subject of the contempt actions(s). Although the contempt actions(s) were heard at the same time as trial, the February 2016 divorce decree does not address the contempt action(s); nor does the decree specifically address the mortgage arrears. Because no other order disposing of the contempt action(s) appears in our record, we do not have jurisdiction over the contempt actions(s) because we lack a final appealable order of such action(s). See *Belitz, supra*. See, also, *Michael B., supra*.

### 7. Division of Marital Estate

In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016). Equitable property division under Neb. Rev. Stat. § 42-365 (Reissue 2016) is a three-step process. *Stanosheck, supra*. The first step is to classify the parties' property as marital or nonmarital. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties. *Id.* The ultimate test in determining the appropriateness of a property division is fairness and reasonableness as determined by the facts of each case. *Id.* See, also, *Liming v. Liming*, 272 Neb. 534, 547, 723

N.W.2d 89, 99 (2006) ("Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.").

The date on which a court values the marital estate should be rationally related to the property composing the marital estate. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016).

Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Brozek, supra*. Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id*. Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. *Id*. Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Id*. If the separate property remains segregated or is traceable into its product, commingling does not occur. *Id*. The burden of proof rests with the party claiming that property is nonmarital. *Id*.

(a) Marital Residence Equity

The district court awarded Dena the marital residence and attributed $41,112.54 in equity to it; she claims the equity should have only been $37,593 (a difference of $3,519.54). To arrive at its equity value, Dena claims the court erroneously relied upon David's proffered balance on the mortgage as of April 30, 2014, which was nearly a year after David had vacated the residence. Dena says the home was valued at $242,000 (appraised value from exhibit 27) and the amount owed at the time of separation was $204,407, so the equity was $37,593. She says that exhibit 16 shows the home mortgage balance to be $203,707 as of August 7, 2013. She then suggests the statements reflect the unpaid principal balance was decreasing by $350 per month with each payment. "Therefore, to determine the unpaid principal balance as of the date of separation, the Court simply needed to multiply $350 to the number of months between the date of separation and the date of the August statement (2 months) and then add that amount to the amount of unpaid principal balance on the August statement to determine that the unpaid principal balance in June 2013 was approximately $204,407.00 ($203,707.00 + $700.00)." Brief for appellant at 30.

David argues that "it is important for the court to note that during the parties' separation, David was still making some mortgage payments for the marital home - payments that would allow the amount of equity on behalf of Dena to rise." Brief for appellee at 25. He claims "[i]t is reasonable and within the Court's discretion to consider payments made by David toward the marital home when dividing the assets." *Id*. He points out that Dena states the difference between the amount of equity calculated by the trial court and the amount that should have been used was $3,519.54. But, citing to exhibit 16, David states that the payments he made on the mortgage after separation total at least $7,089.75.

"There is no 'hard and fast' rule concerning valuation dates so long as the selected date bears a rational relationship to the property to be divided, and the selected date is reviewed for an abuse of discretion." *Myhra v. Myhra*, 16 Neb. App. 920, 928, 756 N.W.2d 528, 538 (2008). The district court's decree does not specifically state how it reached the equity value of the marital home. But an equity value of $41,112.54, would mean a home mortgage of $200,887.46; this amount coincides with the unpaid principal balance in the mortgage statement dated April 30, 2014 (exhibit 18, page 5). Exhibit 16, page 8, shows that the unpaid principal balance as of December

23, 2013, was $202,305. Exhibit 16 also shows that David paid the mortgage due through December. Because David was making the mortgage payments on the residence through December, the equity should follow. Therefore, the equity in the home should have been calculated at $39,695 ($242,000 appraised value − $202,305 unpaid balance in December 2013). Upon our de novo review, we find that the court overvalued the home equity by $1,417.54.

### (b) Division of Household Goods and Gifts

The court attributed a value of $4,019 to Dena for household goods awarded to her, and a value of $525 awarded to David. Dena claims the court "made no less than 6 mistakes in its inclusion of multiple assets which should not have been considered marital assets." Brief for appellant at 30. She claims a sofa and loveseat ($425 value) were delivered and paid for post-separation. David claims the sofa and loveseat were ordered before separation, and that Dena did not prove the asset was nonmarital. He acknowledges the conflicting testimony of the parties and states that in such cases it is for the trial court to make a judgment.

Dena claims that a $30 mixer was premarital and two bedroom sets ($325 value) were purchased with inherited money. However, David claims she did not meet her burden of proving that the items were nonmarital.

Dena claims that multiple items (valued at $620) were gifted to the children and yet credited to her in the division of debts and assets. She also claims a sauna was not included in the division of debts and assets; she claims the sauna was gifted to her, but that David sold it around the time of the divorce for $500 and used the money for his own purposes. David argues that Dena's claims are unsubstantiated.

After our de novo review of the record, we find that Dena did not meet her burden to prove that any of the foregoing items should have been considered nonmarital property. See *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016).

### (c) SAC Loan ($4,500)

A "SAC Federal Credit Union" debt of $4,500 was determined to be marital and was assigned to David. Dena argues that "[t]here was very little if any credible evidence offered to support the notion that this was a marital debt." Brief for appellant at 32-33. She says the only evidence of the loan is found in exhibit 18 which shows David took out a loan for $4,500 sometime prior to June 2013. "There was no evidence to support [Dena] having any idea that such Loan existed or what the purpose and use was" for the loan. Brief for appellant at 33. She argues it could have been used for a motorcycle deemed nonmarital, or to pay attorney fees or child support, and further, it is unknown into which bank account the loan was deposited. She claims David gave three different answers when questioned about the loan, and there was no evidence "as to which answer was correct - vehicle, motorcycle hobby or personal reasons." *Id.*

David argues the loan was incurred during the time of the marriage and is therefore considered a marital debt unless proven otherwise by Dena, and she did not prove otherwise. He testified that Dena knew about the loan, which was for his hobby of building and restoring motorcycles, something in which even the children participated.

Based upon our de novo review of the record, we cannot say that the district court abused its discretion when it determined that the debt was marital property and included it in the marital

estate. See *Bergmeier v. Bergmeier*, 296 Neb. 440, 894 N.W.2d 266 (2017). We find no error with respect to this portion of the district court's decree.

### (d) 2012 Tax Debt

The district court determined that a 2012 tax debt of $2,365 was marital debt, and assigned that debt to David. Dena argues that there was insufficient evidence to support that this was a marital debt. Further, to the extent it could be justified as a marital debt, then the 2012 tax refund of $2,138 should have been a marital asset. David claimed the refund went into a joint account, but Dena claims "[n]o such deposit appears in the joint account statements" and Dena claimed she did not receive any of this refund.

David testified that the tax bill ($2,365) was outstanding at the time of separation, but that he had paid the bill prior to trial. He further testified that the outstanding bill was for a joint tax return. He testified that the parties historically amended their tax returns once Dena started receiving checks from her father.

After a de novo review of the record, we cannot say that the district court abused its discretion in determining that the 2012 tax debt was marital.

### (e) Equalization Payment

The only adjustment we made to the court's "balance sheet" is with regard to the equity in the marital residence, which we determined was $39,695 instead of $41,112.54; a difference of $1,417.54. Because the district court divided the marital estate 50/50, Dena's equalization payment must be reduced by $708.77 ($1,417.54 ÷ 2). Her new equalization payment to David is $8,820 and the decree is modified accordingly.

### 8. MILITARY RETIREMENT

The decree states: "[Dena] is awarded $270.00 of [David's] net disposable military pension. The payment thereof shall commence on the first day of the month following the entry of the Decree of Dissolution of Marriage." Although the decree does not specifically state that Dena is awarded $270 "per month," we read the decree to award a monthly payment; and the parties do not dispute that the award was for $270 "per month."

Dena argues that a percentage of the military retirement pay should have been awarded rather than a set amount, and that by not using "the coverture method," she will not receive cost of living increases or other such benefits. Brief for appellant at 39. Dena requests that the matter be remanded to the court "to determine how many months [David] was in the military and how many of those months overlapped with the marriage of the parties in order for the Court to determine what percentage of the retirement should be awarded to both [Dena] and [David]." *Id*. However, David argues that Dena does not cite to any proof that she presented this issue to the trial court, and "[h]er failure to present issues she now wants to complain about, renders them void for consideration on appeal." Brief for appellee at 29.

David is correct that Dena never specifically asked the district court to use the coverture formula when determining Dena's share of David's military retirement pay. At trial, however, David raised the issue. David's attorney stated, "I just wanted to put to [sic] the record the coverture formula." Thereafter, between the attorney's questions and David's answers, the record

reveals that David had 248 months of total military service, of which 108 months were served while married to Dena. The coverture formula can be used when a portion of a retirement pension has been earned by one spouse during the marriage, with other portions being earned before and/or after the marriage. The coverture formula takes the number of months of service earned while married and divides that by the total number of months of service. See *Bergmeier v. Bergmeier*, 296 Neb. 440, 894 N.W.2d 266 (2017). In this case, 108 months divided by 248 months results in 43.54 percent of David's retirement pay being considered marital. If Dena was awarded one-half of that, she would receive 21.63 percent of David's net monthly retirement pay, which at the time of trial was $1,676.82. This would result in Dena receiving $362.70 per month, if a fixed amount was awarded.

However, instead of $362.70 per month being awarded to Dena, the district court ordered a fixed amount of $270 per month. The court provided no explanation for how that figure was determined. In our de novo review of the record, we conclude that the court's figure appears to have been derived from exhibit 22, which was offered by David. That exhibit indicates that David's monthly military retirement pay is $1,256, an amount we know is not correct in light of our review of David's income earlier in this opinion. We have previously determined that David's net monthly retirement pay is $1,676.82. Exhibit 22 also reflects that Dena's portion of the military retirement is an "[a]nticipated 21.55 percent," which is about one-half of the 43.54 percent we determined above to be the marital portion of David's retirement pay. If the district court relied upon that net monthly benefit amount ($1,256) and percentage (which appears to derive from the coverture formula), the resulting amount for Dena's share would be $270.66. Therefore, we conclude the district court arrived at the fixed amount of $270 per month by relying on an inaccurate monthly military retirement figure set forth in exhibit 22. Accordingly, because David's net monthly retirement pay is actually $1,676.82, we find plain error in the fixed dollar amount awarded, and modify the fixed monthly amount from $270 to $363 per month ($1,676.82 × 21.63 percent = $362.70). Although Dena argues that the court should have simply awarded a percentage rather than a fixed amount so that she can receive cost of living adjustments, she does not point to any evidence in the record where this request was made to the district court. And our review of the federal law applicable to dividing military retirement pay indicates that a court can order either a percentage or a fixed monthly amount, with the latter excluded from receiving cost of living adjustments. See 10 U.S.C.A. § 1408(a)(2) and (4) (2010 & Cum. Supp. 2017). Since the district court could award either option, and Dena failed to put on evidence as to why a percentage award was more appropriate than a fixed amount under the circumstances of this case, we cannot say the district court abused its discretion in choosing a fixed award over a percentage award. Accordingly, we modify only the amount of the award as noted above.

Additionally, Dena says the decree fails to address the survivor benefit plan (SBP) "which is presently available to [Dena] pursuant to the original election made upon [David's] retirement while the parties were still married." Brief for appellant at 38. She claims that David could change his election at any time, and could remove Dena and "insert his new wife as the beneficiary of the SBP[.]" Brief for appellant at 39. "The Court should have specifically ordered that the SBP benefit is awarded to [Dena] and that [David] has no right to change such election if such option is available to him or may become available to him in the future." *Id.*

David argues that "[a]t no time prior to this appeal did Dena argue that David should preserve the original [SBP] election made on his retirement plan during the parties' marriage." Brief for appellee at 29. And "[n]owhere in Dena's brief does she cite to any proof that she presented to the trial court the [SBP] election issue[.]" *Id.*

David is correct that Dena never raised the SBP election issue to the district court. Further, Dena has provided us with no case law in her brief showing us that she is definitively entitled to the SBP election. Because this issue was not presented to or ruled on by the district court, we will not consider the issue in this appeal. See *Hargesheimer v. Gale*, 294 Neb. 123, 881 N.W.2d 589 (2016) (appellate court will not consider issue on appeal that was not presented to or passed upon by trial court).

## 9. ALIMONY

David was ordered to pay the home mortgage of approximately $1,400 per month in lieu of temporary alimony. The temporary order filed on August 26, 2013, ordered David to pay the mortgage payment and the basic utilities on the marital residence occupied by Dena; although this order did not say such payment was "in lieu of alimony," a complete reading of the record shows that was the intent of the mortgage payment. As noted previously in this opinion, David did pay the mortgage through December 2013, but has made no payments since that time (his mortgage obligation was apparently suspended from January through November 2014).

Dena says she "was a stay-at-home mother by agreement of the parties for nearly 20 years and she has very limited employment marketability and no post high school degrees with which she can depend upon to obtain employment or make a living good enough to independently provide for herself and her four children." Brief for appellant at 40. Although noting David's 100-percent disability might weigh against alimony presently, she suggests the district court erred by "not finding that an alimony award of $1 at least be awarded to [Dena] so that a modification action could be filed in the future if a material change in circumstances exists to merit such modification." *Id.*

David claims that the district court did not abuse its discretion because he is on a fixed income due to disability, whereas Dena has the ability to engage in gainful employment and has outside sources of income, including a large inheritance. He argues that to require him "to provide for an able-bodied, working adult is not equitable in these circumstances." Brief for appellee at 31.

In considering alimony, a court should weigh four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the party seeking support to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). In addition to the specific criteria listed in § 42-365, a court should consider the income and earning capacity of each party and the general equities. *Brozek, supra.*

The statutory criteria for dividing property and awarding alimony overlap, but the two serve different purposes and courts should consider them separately. *Id.* The purpose of a property division is to distribute the marital assets equitably between the parties. *Id.* The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in § 42-365 make it appropriate. *Brozek, supra.*

- 17 -

The evidence in the record supports the district court's decision to deny an alimony award. David has significant health issues and, as noted by Dena, he is 100-percent disabled. We recognize that Dena was a stay-at-home mother for a number of years. However, at the time of the divorce hearing, the parties' youngest child was almost 11 years old and Dena was working as a "para" for special education students earning $11.27 per hour; she had the opportunities to work during the summers, but chose not to do so. Additionally, Dena had significant inheritance monies. See *Bauerle v. Bauerle*, 263 Neb. 881, 644 N.W.2d 128 (2002) (when entering decree for alimony, court may take into account all property owned by parties at time of decree, whether accumulated by joint efforts or acquired by inheritance). After a de novo review of the record and considering the circumstances of this case, we conclude that the denial of alimony was not an abuse of discretion.

## 10. GAL AND ATTORNEY FEES

The court ordered Dena and David to each pay one-half the $1,726.73 GAL fee. Dena says her income is "substantially lower" than David's income, and further, "the need for a GAL was directly related to [David's] failure to maintain a regular relationship with his children and attempts to reintegrate him with the children." Brief for appellant at 41. Dena also claims she did not want to have the GAL in court during trial, but that David asked him to be present, thereby adding to the GAL's expenses. Dena argues that the court should have ordered David to pay all of the GAL's fees, or for each party to pay in proportion to their current incomes (approximately one-third by Dena, two-thirds by David). David argues that despite Dena's claims that the GAL was secured as a result of his actions, the GAL was appointed subsequent to Dena's request for the appointment; therefore, the court correctly and properly split the GAL fees equally between the parties. Under the circumstances of this case, the district court did not abuse its discretion in ordering each party to pay 50-percent of the GAL fees. See *Smith v. Smith*, 222 Neb. 752, 386 N.W.2d 873 (1986) (allowance, amount, and allocation of guardian ad litem fee is matter within initial discretion of a trial court, involves consideration of equities and circumstances of particular case, and will not be set aside on appeal in absence of an abuse of discretion by trial court).

As for attorney fees, Dena claims that David: failed to pay child support for long periods of time; failed to pay the house payment; failed to answer discovery; caused multiple contempt actions and motions to compel to be filed; refused to pay uncovered medical expenses; "lied to the Court about his income being reduced" and that he lost his job, "all the while continuing to collect a full six-figure salary until just a few months prior to the trial"; and refused to pay therapy expenses. Brief for appellant at 42. These "actions/inactions" by David "significantly increased attorney fees" for Dena, and therefore, she argues that the court erred by not ordering David to pay a reasonable amount in attorney fees to her.

David argues that "Dena mischaracterizes the evidence regarding David's participation in these proceedings," and that he "participated despite suffering many health related issues." Brief for appellee at 32. Further, "[t]here is no indication that David acted frivolously in these proceedings and he should not be required to bear the burden of both parties' attorneys where Dena has been equally involved in many of the issues the parties have faced over the last several years." *Id.*

A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). A dissolution court should consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Id*. After reviewing the relevant factors, we conclude that the district court did not abuse its discretion by declining to award Dena attorney fees in the decree.

## VI. CONCLUSION

For the reasons stated above, we find that the district court overvalued the equity in the marital residence by $1,417.54. As a result of the adjustment, Dena's equalization payment to David should be $8,820, and we modify the decree accordingly. We further modify the decree so that child support is consistent with the worksheet attached to this opinion. Additionally, finding plain error, we modify the decree so that (1) the uninsured/nonreimbursed healthcare expenses incurred on behalf of the minor children are allocated 40 percent to Dena and 60 percent to David; and (2) Dena's share of David's military retirement pay shall be $363 per month. We affirm the remainder of the decree.

AFFIRMED AS MODIFIED.

Nebraska Child Support Calculator



Case Name: <u>Araujo v. Araujo</u>

Worksheet 1 - Basic Income and Support Calculation

Mother: Head of Household / 3 Exemptions / Not Self Employed
Father: Single / 3 Exemptions / Not Self Employed

| Line | Description | Mother | Father |
|---|---|---|---|
| 1 | Total Monthly Income | $3,798.00 | $2,053.00 |
| 1 | Tax-Exempt Income | $0.00 | $3,700.00 |
| 2.a | Taxes - Federal | $245.33 | $51.13 |
| 2.a | Taxes - Nebraska | $76.18 | $17.78 |
| 2.b | FICA - Social Security | $235.48 | $127.29 |
| 2.b | FICA - Medicare | $55.07 | $29.77 |
| 2.c | Retirement | $0.00 | $0.00 |
| 2.d | Previously Ordered Support | $0.00 | $0.00 |
| 2.e | Regular Support for Other Children | $0.00 | $0.00 |
| 2.f | Health Insurance Premium for Parent | $0.00 | $0.00 |
|  | Other Deductions | $0.00 | $497.62 |
|  | Child Tax Credit | ($0.00) | ($0.00) |
| 2.g | Total Deductions | $612.05 | $723.60 |
| 3 | Net Monthly Income | $3,185.95 | $5,029.40 |
| 4 | Combined Net Monthly Income | $8,215.35 | |
| 5 | Combined Net Annual Income | $98,584.20 | |
| 6 | Each Parent's Percent | 38.78% | 61.22% |
| 7 | Monthly Support from Table (4 Children) | $2,741.00 | |
| 8 | Health Insurance Premium for Children | $0.00 | $93.00 |
| 9 | Total Obligation | $2,834.00 | |
| 10 | Each Parent's Monthly Share | $1,099.03 | $1,734.97 |
| 11 | Credit For Health Insurance Premium Paid | ($0.00) | ($93.00) |
| 12 | Each Parents' Final Share (4 Children, rounded) | $1,099.00 | $1,642.00 |

Worksheet 4 - Number of Children Calculation (final shares are rounded to the nearest whole dollar)

| No. Children | Table Amount | Total Including Health Ins. | Mother's Share of Total | Father's Share of Total | Mother's Final Share | Father's Final Share |
|---|---|---|---|---|---|---|
| 4 | $2,741.00 | $2,834.00 | $1,099.03 | $1,734.97 | $1,099.00 | $1,642.00 |
| 3 | $2,346.00 | $2,439.00 | $945.84 | $1,493.16 | $946.00 | $1,400.00 |
| 2 | $2,050.00 | $2,143.00 | $831.06 | $1,311.94 | $831.00 | $1,219.00 |
| 1 | $1,437.00 | $1,530.00 | $593.33 | $936.67 | $593.00 | $844.00 |